UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY, ALLSTATE FIRE & CASUALTY INSURANCE COMPANY, AND ALLSTATE COUNTY MUTUAL INSURANCE COMPANY, | C.A. No.: 4:25-cv-00368 |
| Plaintiffs, | |
| v. | |
| INNOVO MANAGEMENT LLC, 59 PAIN & REHABILITATION CENTER, INC., 290 PAIN & REHABILITATION, INC., YOUNG AN, M.D., BREEZE MRI LLC, ROBERT CASIMIR, D.O., CXR INVESTMENTS LLC, HETANSH INVESTMENTS, INC. D/B/A HRX INVESTMENTS, THAO T. HUYNH, D.C., INNOVO PHYSICIAN SERVICES PLLC, LAURA TRAN LE, D.C., RAVI PATEL, AND DEEPAK SHARMA, | |
| Defendants. | |

**PLAINTIFFS' FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, and Allstate County Mutual Insurance Company (collectively, "Allstate" and/or "plaintiffs"), by their attorneys, King, Tilden, McEttrick & Brink, P.C., allege as follows:

## I.    <u>INTRODUCTION</u>

1.    Deepak Sharma ("Deepak" or "Sharma") and his co-conspirators, Young An, M.D. ("An"),  Robert Casimir, D.O. ("Casimir"), Thao T. Huynh, D.C. ("Huynh"), Laura Tran Le, D.C. ("Le"), Ravi Patel ("Ravi" or "Patel"), by and through the operation of their respective businesses, 59 Pain and Rehabilitation Center, Inc. ("59 Pain"), 290 Pain & Rehabilitation, Inc. ("290 Pain"), Breeze MRI LLC ("Breeze MRI"), CXR Investments LLC ("CXR"), Hetansh Investments, Inc. d/b/a HRX Investments, Inc. ("HRX"), Innovo Management LLC ("Innovo Management"), and Innovo Physician Services PLLC ("IPS") (hereinafter collectively referred to as the "Defendants"), devised and executed a scheme to defraud Allstate by submitting and causing to be submitted false and fraudulent records and bills ("false medical documentation") for unnecessary medical services purportedly provided to motor vehicle accident victims (also referred to herein as "Allstate claimants"), through the U.S. Mail seeking to collect payment from Allstate.

2.    The scheme illustrated below, was intentionally initiated, promoted, financed, operated and/or maintained by the Defendants.

3.    The Defendants' scheme involved intentional fraudulent conduct, including:

    **a.**    Engaging in an unlawful fee-splitting and patient referral agreement involving illegal kickback payments;

    **b.**    Ceding medical decision-making to unlicensed laypersons who dictate and control the healthcare services (consultations, treatment, and procedures) administered to Allstate claimants;[1]

    **c.**    Billing for healthcare services that were not reasonable nor medically necessary;

    **d.**    Billing for a predetermined treatment protocol regardless of the Allstate claimants' individual medical needs; and

    **e.**    Billing for services that were not rendered as represented.

---

[1] The term "healthcare services" shall include medical and chiropractic consultations, treatment, procedures, and related services.

2

4.     The Defendants intentionally targeted the insurance benefits available to Allstate claimants to ensure a steady stream of revenue.

5.     The Defendants abused the insurance coverage of Allstate claimants by billing for healthcare services that the Defendants had no legal right to collect.

6.     The Defendants intentionally siphoned away payments from the proceeds of the insurance monies paid by Allstate to resolve Allstate claimants' medical expense and bodily-injury claims.

7.     The insurance fraud scheme perpetrated by the Defendants was designed to, and did in fact, result in payments from Allstate to and for the benefit of the Defendants.

8.     The Defendants mailed false medical documentation directly to Allstate.

9.     The Defendants mailed false medical documentation to Allstate claimants and/or their personal injury attorneys who, in turn, mailed the documents to Allstate in support of the Allstate claimants' medical expense and bodily-injury claims.

10.     In all cases, Allstate reasonably relied upon the Defendants' false medical documentation, and the misrepresentations and omissions of material fact contained therein concerning (1) unlawful referrals and kickbacks; (2) layperson control of medical decision-making; (3) unnecessary healthcare services provided pursuant to a predetermined treatment protocol at grossly excessive charges; and (5) billing for services that were not rendered as represented.

11.     The Defendants intended for Allstate to rely on the representations made in the Defendants' records and bills when determining whether to pay medical expense and bodily-injury claims.

12. Allstate made payments on these claims in direct reliance on the false medical documentation created by the Defendants.

13. As a result of the Defendants' fraudulent acts, Allstate has paid millions of dollars to resolve insurance claims that were based on the false medical documentation submitted by or on behalf of the Defendants.

14. Allstate made payments to the Defendants in the amount of **$564,137.93**.

15. Allstate was also caused to make payments in connection with bodily-injury claims presented by the Allstate claimants in the amount of **$3,544,288.59.**

16. By this Complaint, Allstate asserts claims against the Defendants for: (a) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961, *et seq.*; (b) common law fraud; (c) civil conspiracy to commit fraud; and (d) restitution of money had and received.

17. Allstate also seeks declaratory relief that no pending claims submitted to it by, or on behalf of, the Defendants, 59 Pain, 290 Pain, Breeze MRI, and IPS are compensable.

## II.    **THE PARTIES**

### A.    **PLAINTIFFS**

18. Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Fire & Casualty Insurance Company, are corporations duly organized and existing under the laws of the State of Illinois, having their principal place of business in Northbrook, Illinois.

19. Allstate County Mutual Insurance Company is a corporation duly organized and existing under the laws of the State of Texas, having its principal place of business in Irving, Texas.

20.     At all relevant times to the allegations contained in this Complaint, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, and Allstate County Mutual Insurance Company were each authorized to conduct business in Texas.

**B.**    **DEFENDANTS**

    **1.**    **Medical Corporation Defendants**

        **a.**    ***59 Pain & Rehabilitation Center, Inc.***

21.     59 Pain was organized under the laws of the State of Texas in 2005.

22.     59 Pain's registered address is 7149 Southwest Fwy, Houston, Texas 77074, which is also IPS's principal place of business.

23.     Le incorporated and owns 59 Pain.

24.     59 Pain is a chiropractic clinic, which markets itself as treating work, auto, and sports injuries.

25.     Le currently serves as the president and manager of 59 Pain.

26.     Le purportedly treated Allstate claimants at 59 Pain.

27.     Le created records and bills for the services she purportedly rendered to Allstate claimants to prove to Allstate and the Allstate claimants, and others that the services were medically necessary.

28.     As part of this scheme, 59 Pain was caused to bill Allstate for fraudulent healthcare services in relation to Allstate claimants at issue in this Complaint.

29.     Le's records and bills contained material misrepresentations that Allstate relied on when issuing payment.

30.     Huynh currently serves at the vice president and manager of 59 Pain.

31.     Due to their ownership and control over 59 Pain, Le and Huynh are responsible for the unlawful, medically unnecessary, and unreasonably charged services billed by 59 Pain in connection with Allstate claimants.

**b.     *290 Pain & Rehabilitation, Inc.***

32.     290 Pain was organized under the laws of the State of Texas in 1998.

33.     290 Pain is a chiropractic clinic with its registered address at 10900 Northwest Freeway, Suite 115, Houston, Texas 77092.

34.     290 Pain's principal place of business is 10694 Jones Rd., Ste 107, Houston, Texas 77065.

35.     Le incorporated and owns 290 Pain.

36.     Le currently serves as the president and manager of 290 Pain.

37.     Huynh currently serves as an employee and/or manager of 290 Pain.

38.     Huynh purportedly treated Allstate claimants at 290 Pain.

39.     Huynh created records and bills for the services she purportedly rendered to Allstate claimants to prove to Allstate and the Allstate claimants, and others that the services were medically necessary.

40.     As part of this scheme, 290 Pain was caused to bill Allstate for fraudulent healthcare services in relation to Allstate claimants at issue in this Complaint.

41.     Huynh's records and bills contained material misrepresentations that Allstate relied on when issuing payment.

42.     Due to their ownership and control over 290 Pain, Le and Huynh are responsible for the unlawful, unreasonable and medically unnecessary services billed by 290 Pain in connection with Allstate claimants.

c.      ***Breeze MRI LLC***

43.     Breeze MRI is a corporation that was organized in the state of Texas in 2017.

44.     Breeze MRI's registered address is 5900 Balcones Drive, Suite 100, Austin, Texas 78731.

45.     Patel incorporated and owns Breeze MRI.

46.     Patel is also the president, CEO, manager, and director of Breeze MRI.

47.     Breeze MRI purportedly engages in providing MRI and X-ray services.

48.     On information and belief, neither Patel nor Breeze MRI have the requisite medical licenses for radiation related equipment or operator registrations in Texas.

49.     Breeze MRI purportedly provided Allstate claimants with medical services.

50.     Either Patel, or someone under his direction, created records and bills for the services that were purportedly rendered to the Allstate claimants to prove to Allstate and the Allstate claimants, and others that the services were medically necessary.

51.     As part of this scheme, Breeze MRI was caused to bill Allstate for fraudulent healthcare services in relation to Allstate claimants at issue in this Complaint.

52.     The Breeze MRI records and bills contained material misrepresentations that Allstate relied on when it issued payment.

53.     Due to his ownership and control over Breeze MRI, Patel is responsible for the unlawful, unreasonable and medically unnecessary services billed by Breeze MRI in connection with Allstate claimants.

d.      ***Innovo Physician Services PLLC***

54.     IPS is a corporation organized in the state of Texas in 2020.

55.     IPS's registered address and principal place of business is 10694 Jones Rd., Suite 107, Houston, Texas 77065.

56.     Casimir incorporated and owns IPS with An.

57.     Casimir served as the president, as a member, as a manager, and as a physician, of IPS.

58.     Casimir purportedly provided Allstate claimants with medical services at IPS.

59.     Casimir created records for the services that were purportedly rendered to Allstate claimants to prove to Allstate and the Allstate claimants, and others that the services were medically necessary.

60.     An served as a member, as a manager, and as a physician of IPS.

61.     An purportedly provided Allstate claimants with medical services at IPS.

62.     An created records for the services that were purportedly rendered to Allstate claimants to prove to Allstate and the Allstate claimants, and others that the services were medically necessary.

63.     As part of the scheme, IPS was caused to bill Allstate for fraudulent healthcare services in relation to Allstate claimants at issue in this Complaint.

64.     The IPS records and bills contained material misrepresentations that Allstate relied on when it issued payment.

65.     IPS purportedly maintains offices at four locations in and around Houston, Texas. The IPS website listed the following locations:

INNOVO PHYSICIAN SERVICES

1) Northwest: 10900 Northwest Fwy, Houston, TX 77092
2) Cypress: 10694 Jones Rd. Ste 107, Houston, TX 77065
3) Southwest: 7149 Southwest Fwy, Houston, TX 77074
4) Lake Jackson: 101 West Way, Lake Jackson, TX 77566

66.     The IPS website claimed (up until September 27, 2024) that IPS was operated by personal injury and motor vehicle accident "specialists" and was run by "honest physicians" who provide primary care, pain management and anesthesia for interventional procedures.

67.     Due to their ownership and control over IPS, An and Casimir are responsible for the unlawful, unreasonable and medically unnecessary services billed by IPS in connection with Allstate claimants.

### 2.     **Management Defendants**

#### a.     ***Innovo Management LLC***

68.     Innovo Management was organized under the laws of the State of Texas in 2022.

69.     Innovo Management's registered address is 10694 Jones Rd., Ste 107, Houston, Texas 77065. This is the same registered address as 290 Pain and IPS.

70.     Innovo Management is the alter ego of IPS.

71.     Sharma incorporated and owns Innovo Management.

72.     Sharma is the CEO and manager of Innovo Management.

73.     Sharma manages and controls IPS through Innovo Management.

74.     Neither Sharma nor Innovo Management has a medical license in Texas.

75.     Sharma, through Innovo Management, controlled, operated, and profited from IPS.

76.     Due to Sharma and Innovo Management's control over IPS, Sharma and Innovo Management are responsible for the unlawful, unreasonable and medically unnecessary services billed by IPS in connection with Allstate claimants.

### b.      *CXR Investments LLC*

77.     CXR was organized under the laws of the State of Texas in 2018.

78.     CXR's registered address is 33 Cherry Hills Dr, Jersey Village, Texas, 77064.

79.     Patel incorporated and owns CXR.

80.     Patel currently serves as the president, as a director, and as a manager of CXR.

81.     CXR purports to be a factor funding company that contracts with medical providers to purchase accounts receivables.

82.     IPS paid CRX to provide it with patient referrals.

83.     Neither Patel nor CXR have any medical related licenses in Texas.

84.     Patel, through CXR, controlled, operated, and profited from 59 Pain, 290 Pain, Breeze MRI, and IPS.

85.     Due to Patel's control through CXR over 59 Pain, 290 Pain, Breeze MRI, and IPS, Patel and CXR are responsible for the unlawful, unreasonable and medically unnecessary services billed by 59 Pain, 290 Pain, Breeze MRI, and IPS in connection with Allstate claimants.

### c.      *Hetansh Investments, Inc. d/b/a HRX Investments*

86.     HRX was organized under the laws of the State of Texas in 2022.

87.     HRX's registered address is 4040 Koehler St Apt 3023, Houston, Texas 77007.

88.     Sharma incorporated and owns HRX.

89.     HRX purports to be a factor funding company that contracts with medical providers to purchase accounts receivables.

90.     IPS paid HRX to provide it with patients referrals.

91.     Neither Sharma nor HRX have any medical related licenses in Texas.

92.     Sharma, through HRX controlled, operated, and profited from 59 Pain, 290 Pain, Breeze MRI, and IPS.

93.     Due to Sharma's control through HRX over 59 Pain, 290 Pain, Breeze MRI, and IPS, Sharma and HRX are responsible for the unlawful, unreasonable and medically unnecessary services billed by 59 Pain, 290 Pain, Breeze MRI, and IPS in connection with Allstate claimants.

### d.     *Deepak Sharma*

94.     Sharma is a resident and citizen of the State of Texas.

95.     Sharma resides at 4040 Koehler Street Apt 3023, Houston, Texas 77007.

96.     Sharma owns, operates, and controls the Defendants, Innovo Management and HRX.

97.     Sharma owns, operates, and controls caraccidentcares.com.

98.     Sharma does not have a license to practice medicine in Texas.

99.     Because he directly participated in the operation and management of 59 Pain, 290 Pain Breeze, MRI and IPS through his businesses, and throughout the course of this scheme, Sharma is responsible for the fraudulent services rendered to Allstate claimants, and is thus also jointly and severally liable for the payments that Allstate was wrongfully induced to make to and on behalf of 59 Pain, 290 Pain, Breeze MRI, and IPS.

### e.     *Ravi Patel*

100.     Patel is a resident and citizen of the State of Texas.

101.     Patel resides at 8230 Scenic Shore Ct, Sugar Land, Texas 77478.

102.     Patel owns, operates, and controls CXR and Breeze MRI.

103.   Patel is not licensed to practice medicine in Texas.

104.   Because he directly participated in the operation and management of 59 Pain, 290 Pain Breeze, MRI and IPS through his businesses, and throughout the course of this scheme, Patel is responsible for the fraudulent services rendered to Allstate claimants, and is thus also jointly and severally liable for the payments that Allstate was wrongfully induced to make to 59 Pain, 290 Pain, Breeze MRI, and IPS.

### 3.   Medical Provider Defendants

#### a.   *Young An, M.D.*

105.   An is a resident and citizen of the State of Texas.

106.   An is licensed to practice medicine in the State of Texas.

107.   An is the business partner of Casimir, and is the purported owner, a manager, and a physician at IPS.

108.   An purportedly provided treatment to Allstate claimants at IPS.

109.   The services billed for by An through IPS were fraudulent because IPS submitted bills for services that were unlawful, unreasonable, and medically unnecessary.

110.   Because he directly participated in the operation and management of IPS throughout the course of this scheme, An is responsible for the fraudulent services rendered to Allstate claimants, and is thus also jointly and severally liable for the payments that Allstate was wrongfully induced to make to IPS.

#### b.   *Robert Casimir, M.D.*

111.   Casimir is a resident and citizen of the State of Texas.

112.   Casimir is licensed to practice medicine in the State of Texas.

113.    Casimir is the business partner of An and was the purported owner, a manager, and a physician at IPS.

114.    Casimir purportedly provided treatment to Allstate claimants at IPS.

115.    Casimir caused IPS to bill for fraudulent and medically unnecessary services for patients of IPS.

116.    The services billed by Casimir through IPS were fraudulent because IPS submitted bills for services that were unlawful, unreasonable, and medically unnecessary.

117.    Because he directly participated in the operation and management of IPS throughout the course of this scheme, Casimir is responsible for the fraudulent services rendered to Allstate claimants, and is thus also jointly and severally liable for the payments that Allstate was wrongfully induced to make to this entity.

### c.    *Thao T. Huynh, D.C.*

118.    Huynh is a resident and citizen of the State of Texas.

119.    Huynh is a licensed chiropractor in the State of Texas.

120.    Huynh owns, operates and controls the Defendants, 59 Pain and 290 Pain.

121.    Huynh caused 59 Pain and 290 Pain to bill for fraudulent, and medically unnecessary services for patients of 59 Pain and 290 Pain.

122.    The services billed by Huynh through 59 Pain and 290 Pain were fraudulent because 59 Pain and 290 Pain submitted bills for services that were unlawful, unreasonable, and medically unnecessary.

123.    Because she directly participated in the operation and management of 59 Pain and 290 Pain Breeze, through her businesses, and throughout the course of this scheme, Huynh is responsible for the fraudulent services rendered to Allstate claimants, and is thus also jointly and

severally liable for the payments that Allstate was wrongfully induced to make to 59 Pain and 290 Pain.

### d.    *Laura Tran Le, D.C.*

124.    Le is a resident and citizen of the State of Texas.

125.    Le is a licensed chiropractor in the State of Texas.

126.    Le owns, operates and controls, 59 Pain and 290 Pain.

127.    Le caused 59 Pain and 290 Pain to bill for fraudulent, and medically unnecessary services for patients of 59 Pain and 290 Pain.

128.    The services billed for by Le through 59 Pain and 290 Pain were fraudulent because 59 Pain and 290 Pain submitted bills for services that were unlawful,  unreasonable, and medically unnecessary.

129.    Le made unlawful referrals to IPS through 59 Pain and 290 Pain.

130.    Because she directly participated in the operation and management of 59 Pain, 290 Pain, and Breeze, through her businesses, and throughout the course of this scheme, Le is responsible for the fraudulent services rendered to Allstate claimants, and is thus also jointly and severally liable for the payments that Allstate was wrongfully induced to make to 59 Pain and 290 Pain.

## III.    JURISDICTION AND VENUE

131.    Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over this action relating to the claims brought by the plaintiffs under 18 U.S.C. § 1961, *et seq.* because they arise under the laws of the United States.

132.    Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

133.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2), whereas a substantial part of the events giving rise to Allstate's claims occurred in the Southern District of Texas.

## IV.    FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### A.    IMPACT OF DEFENDANTS' SCHEME TO DEFRAUD ON ALLSTATE

134.    Allstate insures motor vehicles in the State of Texas.

135.    Providers of healthcare services bill Allstate directly under applicable policies of insurance.

136.    Providers of healthcare services routinely submit bills and in some cases liens to Allstate in connection with bodily-injury claims made by Allstate claimants.

137.    The Defendants sought to bolster the appearance of injury to Allstate claimants by routinely prescribing clinically unwarranted and predetermined (a) courses of physical therapy and chiropractic treatment, (b) pain management consultations, and (c) surgical injections and other pain management procedures and treatment, regardless of their ages, injury histories, and comorbidities.

138.    The Defendants fraudulently billed Allstate for healthcare services when Defendants falsely represented to Allstate that the healthcare services were medically necessary and prescribed by independent healthcare professionals hired and retained directly by the Allstate claimants.

139.    In reasonable reliance on the Defendants' material representations, Allstate made payments to or for the benefit of the Defendants.

### B.    STRUCTURE OF THE DEFENDANTS' SCHEME TO DEFRAUD

140.    The scheme described by this Complaint was driven by laypersons in the State of Texas.

141.    The Defendants' conduct constitutes an intentional violation of Texas law governing medical decision-making, kickback payments, and unlawful medical referrals.

142.    The primary objective of the Defendants' scheme was to deliver fraudulent and medically unnecessary treatment to patients, not for the benefit of the patients, but rather, to maximize profits to the Defendants.

143.    To achieve their goal, the Defendants colluded to unlawfully operate 59 Pain, 290 Pain, Breeze MRI, and IPS by submitting false medical documentation and invoices for healthcare services that were unlawful, unnecessary, exaggerated, and/or were not performed as represented.

144.    The false representations regarding the Defendants' services were intentionally placed on bills submitted to insurers such as Allstate for the specific purpose of obtaining payment in violation of Texas law.

145.    The Defendants perpetrated their scheme by giving the appearance that the businesses were legitimate companies in the business of facilitating and/or providing healthcare.

146.    Unless otherwise pled to the contrary, all documents, notes, reports, health invoices, medical diagnoses, CPT Code tally sheets, referrals, letters and request for payments in connection with the insurance claims referenced throughout this pleading traveled through the U.S. Mail.

147.    As set out below, the Defendants fraudulently billed for healthcare services in connection with Allstate claimants.

### 1.    Unlawful Methods Used To Solicit Patients

148.    The Defendants unlawfully solicited patients by offering financial compensation in exchange for treatment and referrals.

149.    The Defendants intentionally obfuscated this fact from Allstate, and others because they knew that Allstate would not have paid the claims directly or as part of bodily injury case

payments had it known that the Defendants were unlawfully participating in an unlawful quid-pro-quo referral agreement.

150.    Allstate only discovered the Defendants improper referral scheme after interviewing Defendants, Casimir and An, in August of 2024, and September of 2024, respectively, in connection with a collateral lawsuit, _Allstate Insurance Company et al. v. Wellness Pain & Associates, Inc. et al._, Case No. 4:24-cv-02091, (S.D. Tex)

151.    The Defendants targeted Allstate claimants involved in motor vehicle accidents, which resulted in illegal kickbacks, and the overutilization of healthcare services.

152.    Admittedly, IPS marketed itself by boasting about its "large referral network for any surgical interventions" and lists "medical clearance for surgical procedures" as one of its main primary care services.

153.    Under Texas law, it is unlawful for: (1) a person to "solicit[] or receive[], directly or indirectly, overtly or covertly, any remuneration, including any kickback, bribe, or rebate, in cash or in kind for referring an individual to a person for the furnishing of, or for arranging the furnishing of, any item or service for which payment may be made, in whole or in part, under the Medicaid or other HHS program;" (2) "a physician [to] refer[] a Medicaid or other HHS program recipient to an entity with which the physician has a financial relationship for the furnishing of designated health services;" and, (3) a person to "fail[s] to disclose documentation of financial relationships necessary to establish compliance with [state and federal law]." 1 Tex. Admin. Code § 371.1669 (Texas Stark Law).

154.    The solicitation and exploitation of motor vehicle accident victims for profit or professional gain is strictly prohibited in the State of Texas, as is the use of factors other than legitimate medical judgment to bill insurers.

155. The Texas Patient Solicitation Act prohibits payment to any person or entity for referring a patient for healthcare services. 3 Tex. Occ. Code § 102.001.

156. If an individual knowingly participated in the exchange, he or she is at risk of prosecution.

157. A "payment" under the Texas Patient Solicitation Act means any remuneration, whether it is cash or in kind.

158. Prohibited payments include veiled value such as providing office space or services to referring providers for less than fair market value.

159. Despite Texas' prohibition of patient solicitation, the Defendants actively employed a number of unlawful methods to obtain and refer patients for profit.

160. The Defendants referral scheme was largely coordinated and executed by Sharma and Patel, through their respective businesses.

161. Based on the information obtained by Allstate through its investigation, Sharma and Patel induced medical providers (physicians and chiropractors), like An, Casimir, Huynh, and Le to participate in the scheme by paying kickbacks and splitting fees with them, for the purpose of procuring and sharing patients by way of cross-referrals regardless of whether the treatment was medically necessary, to increase profits.

162. By his own words, An recognized that the Defendants Sharma and Patel were schemers.

163. A true and accurate depiction of An's sworn statement wherein he discussed the partnership between Deepak and Sharma is depicted below:

> 8    A.  So initially it appeared like they were
>
> 9  working separately, but, like I said, we are having
>
> 10  this whole audit of Innovo.  Now I have my
>
> 11  suspicions that, you know, they did some things
>
> 12  together.  You know, I don't know, like -- I guess
>
> 13  the best way I can describe it is scheming.  They
>
> 14  did some scheming together.  But initially when I
>
> 15  met them, it was kind of like they were separate.

164.    The owners of 59 Pain, 290 Pain, Breeze MRI, CXR, HRX, Innovo Management, and IPS are among those that cross-referred patients to each other for profit.

165.    The damages sought in this case relate to fees charged and in many cases, paid to the medical facilities: 59 Pain, 290 Pain, Breeze MRI and IPS.

166.    Because of the inherent conflict of interest involved in medical providers referring patients to a facility in which the provider will profit, strict and complete disclosure to patients is mandated as a matter of law.  The Defendants intentionally ignored their disclosure obligations.

167.    Such financial relationships taint the healthcare process whereas referrals are being driven more by profit than patient care.

168.    The Defendants' scheme was driven by profit at the expense of patient care.

a.    *Sharma Referrals*

169.    Sharma owns and operates a network of businesses in Texas.  The entities that comprise the network include caraccidentcares.com, HRX, and Innovo Management (hereinafter referred to collectively as the "Sharma businesses").

19

170.   Sharma exercised supervisory responsibility over the employees and independent contractors that worked at caraccidentcares.com, HRX, and Innovo Management.

171.   On information and belief, the Sharma businesses shared common bank accounts, management, employees, and practices and procedures.

172.   Sharma's business, caraccidentcares.com, is a medical referral website wherein Sharma has marketed himself as a liaison between those who were purportedly injured in a motor vehicle accident, and medical providers (chiropractors, diagnostic testing facilities, and pain management clinics) located in Greater Houston area.

173.   Through caraccidentcares.com, and other means, Sharma recruited patients involved in motor vehicle accidents from their attorneys and other medical providers.

174.   After Sharma recruited the patients, he selected medical facilities based on the providers' willingness to overtreat patients for the sole purpose of increasing profits.

175.   A true and accurate excerpt from the "About" page of caraccidentcares.com is depicted below:

> We are your local team to help your local people who get into a car accident. We try to cover all aspects of care starting from finding the Emergency Room for the car accident victim and after that the chiropractor care and if needed down the road to find the diagnostic facility and pain management of pt choice.

176.   Sharma routinely referred Allstate claimants who were purportedly injured in motor vehicle accidents to participating healthcare businesses, including 59 Pain and 290 Pain (chiropractic clinics), Breeze MRI (diagnostic testing facility), and IPS (pain management clinic).

177.   Sharma's business, Innovo Management, purported to be a medical clinic management company.

178.    Innovo Management was formed shortly after IPS was opened.

179.    Innovo Management was ostensibly formed for the sole purpose of running the administrative side of IPS, such as scheduling patients, purchasing supplies, and renting equipment, thereby freeing An and Casimir to concentrate on patient care. Indeed, to the general public, Innovo Management was a seemingly legitimate affiliate of, or the administrative branch of IPS.

180.    In truth, Innovo Management was formed as a method to obfuscate the Defendants' fraudulent scheme. Instead of focusing on the administrative duties it purportedly contracted with IPS to do,  Sharma, through Innovo Management, steered patients it acquired through the Sharma businesses to IPS in exchange for money that was paid to Innovo Management by IPS.

181.    According to An, Innovo Management's only role was to find and refer patients to IPS.

182.    A true and accurate excerpt from An's sworn statement concerning Innovo Management is depicted below:

```
1    Q.  Okay.  Who are these individuals?  I think
2  you said marketers, you called them?
3    A.  Deepak and Ravi.
4    Q.  How did you guys become affiliated with
5  Deepak and Ravi?
6    A.  I met them through Dr. Casimir and Dr. Do.
7    Q.  Did they have an ownership interest in
8  Innovo?
9    A.  No.
10   Q.  Were they involved in management of Innovo?
11   A.  Not really.
12   Q.  What was their function, if anything, with
13  Innovo?
14   A.  Their function was they got patient
15  referrals.  They would link us with, like, the
16  chiropractor, or whoever, and help us get referrals.
17   Q.  Did they have a business name?  Did they
18  operate under a particular business name?
19   A.  One of their businesses that they operated
20  that I know was called Innovo Management, something
21  like that.
```

183.    Pursuant to the IPS and Innovo Management referral agreement, which was intentionally misclassified by the Defendants as a practice management contract, IPS was required to pay Innovo Management at least $2,000 dollars per month depending on the revenues IPS collected from medical services, in exchange for patient referrals.

184.    A true and accurate excerpt from the management contract is depicted below:

**MANAGEMENT SERVICES AGREEMENT**

THIS MANAGEMENT SERVICES AGREEMENT is entered into 04/28/2022 by and between **Innovo Physician Services, PLLC** Texas professional limited liability company ("**Practice**") and **Innova Management LLC,** a Texas limited liability company. ("**Manager**").

\*    \*    \*

Furthermore, Practice and Manager agree that it will be impracticable to ascertain and segregate all of the exact costs and expenses that will be incurred by Manager from time to time in performance of his obligations under this Agreement. However, it is the intent of the parties that the fees paid to Manager be reasonable and approximate its costs and expenses, plus a reasonable return, considering the investment and risk taken by Manager and the value of the services provided by Manager. Practice agrees to pay a Management Fee to Manager in an amount equal to a $2000 of Revenues Collected, as hereinafter defined. For purposes of this Agreement, "Revenues Collected" shall be defined as an amount equal to the total of any monies received from patients and/or third-party payors, and deposited in the Practice's account, less any refunds, during any given month.

185.    In addition to a guaranteed payment of at least $2,000 a month to Innovo Management, IPS also paid Sharma $3,000.00 and Patel $1,000.00 per month for their referral services. See IPS's business expense spreadsheet attached as Exhibit 1.

186.    To further expand his profits, Sharma also formed HRX shortly after Innovo Management and IPS were opened.

187.    HRX represented that it was medical factor funding businesses.

188.    The act of purchasing account receivables at a discounted rate from a medical provider is commonly referred to as factor funding. The finance company (the factor) advances the medical provider (the seller) some amount in exchange for sellers' accounts receivable for the medical services provided to patients. The party responsible for payment (the account debtor) will make payment directly to the factor.

189.    In addition to contracting with IPS through Innovo Management, Sharma contracted with IPS through HRX.

190.    HRX purported to be in the business of "exclusively" purchasing account receivables from IPS for medical services related to "procedures" that IPS purportedly rendered to patients who were involved in motor vehicle accidents.

191.    The HRX factor agreement, however, was bogus and was created to obfuscate Sharma's control over IPS, and its physicians and nurse practitioners—which is discussed in greater detail below.

192.    Based on the information discovered by Allstate in the course of its investigation, HRX did not purchase account receivables from IPS.  Instead, HRX was used as another conduit by Sharma to supply IPS with patients.

193.    By contracting with IPS through Innovo Management and HRX, Sharma granted himself the unchecked ability to run all aspects of IPS unfettered.

194.    As such, Sharma was motivated to push IPS, An, and Casimir to prescribe, treat and administer medical treatment to Allstate claimants that was unlawful, unreasonable and medically unnecessary.

195.    Sharma then generated IPS bills, by way of Innovo Management, so he could profit further from the improper referrals.

196.    Such conduct is improper and unlawful, and any billing submitted to Allstate based on these referral arrangements was fraudulent.

### b.    *Patel Referrals*

197.    Patel owns CXR, Breeze MRI, and non-party Lonestar MRI, LLC (hereinafter referred to collectively as the "Patel businesses").

198.    Patel exercised supervisory responsibility over the employees and independent contractors that worked at CXR, Breeze MRI, and Lonestar MRI, LLC.

199.    On information and belief, the Patel businesses shared common bank accounts, management, employees, and practices and procedures.

200.    Patel's business, CXR, like HRX, purported to be in the business of "exclusively" purchasing account receivables from IPS for medical services that IPS purportedly rendered to patients who were involved in motor vehicle accidents.

201.    After it purportedly purchased account receivables from IPS, CXR collected the account receivables from third-party payers, like Allstate.

202.    On or around the time that IPS first contracted with CXR, Innovo Management separately contracted with CXR to allegedly provide CXR with business and organizational strategy, financial, investment management and advisory services.

203.    This arrangement, however, like CXR's funding agreement with IPS, was bogus, and was created to obfuscate the fact that CXR and Innovo Management were exchanging funds to facilitate the payment of kickbacks to attorneys and other medical providers, and to split fees.

204.    In truth, instead of exclusively purchasing account receivables from IPS, Patel, through CXR, controlled the flow of business, and steered patients it acquired through the Patel businesses, in conjunction with Sharma businesses, to 290 Pain, 59 Pain, IPS, and Breeze MRI – in exchange for money, which was paid to CXR by IPS, and others.

205.    Based on the information obtained during Allstate's investigation, CXR made no payments to IPS, instead IPS made payments to CXR through Innovo Management at the direction of Sharma.

206.    A true and accurate excerpt from Casimir's sworn statement discussing CXR is depicted below:

```
14        Q.   Okay.  So you mentioned CXR.  What type of
15    company is that?
16        A.   CXR is essentially -- I guess the way I
17    would describe it is a middleman, sort of like
18    commercial insurance, like Blue Cross, Aetna,
19    Medicare even.
20             So they have a group of patients.  They
21    have their network of their referrals.  And so they
22    have, I guess, a group of patients that need to be
23    taken care of, and then they farm out to medical
24    providers on whoever is available.
```

*    *    *

```
2        Q.   But your understanding of their function is
3    that they would provide you with patients?
4        A.   Correct.
```

207.    According to An, IPS wrote CXR checks for thousands of dollars for reasons he claims to be unknown.

208.    A true and accurate excerpt from An's sworn statement discussing the payments to CXR is depicted below:

```
16    Q.  Now, let me ask you, are you familiar with
17  a company called CRX?
18    A.  Yes, because I've written checks to CRX.
19    Q.  What were you writing checks to CRX for?
20    A.  I don't know.  I hope that our accountants
21  can find out.
22    Q.  Who told you to write a check to CRX?
23    A.  Deepak.
24    Q.  Is that one of the checks that was, like,
```

*      *      *

```
1  for $10,000?
2    A.  Yes.  I mean, usually when I would write
3  these checks, they were a lot.  You know, that's why
4  I would ask, "Hey, what exactly is this for" and
5  blah, blah, blah, blah.
```

209.    In addition, IPS routinely sent referrals that originated with CXR back to CXR with the knowledge that its owner, Patel, also owned Breeze MRI and Lonestar MRI, LLC.

210.    According to Casimir, whenever he ordered an MRI for a patient, he would let the referring party decide where the MRI would be taken.

211.    A true and accurate excerpt from Casimir's sworn statement concerning orders for MRIs is depicted below:

```
15              Are you familiar with a company named
16    Breeze.
17        A.   Breeze MRI?
18        Q.   Yes.
19        A.   So Ravi owns that.  He also owns that CXR
20    company.
21        Q.   Can you tell me about Breeze.
22        A.   It's an MRI facility.
```

212.    Casimir knew Patel owned Breeze MRI, Lonestar MRI, LLC, and CXR.

213.    Moreover, Breeze MRI reportedly paid a portion of a $20,000.00 fee per month for IPS's advertising. *See* IPS's business expense spreadsheet attached as Exhibit 1.

214.    Whenever Casimir ordered an MRI for a patient that was referred by CXR, he referred the patient back to CXR knowing that Patel was the owner of Breeze MRI and Lonestar MRI, LLC, and would unlawfully and undoubtedly refer the patient to his own business, Breeze MRI and/or Lonestar MRI, LLC.

215.    In fact, Casimir and his brother, Vince Casimir, are listed on the certificate of formation, filed by Patel with the Secretary of State, as managing members of Lonestar MRI, LLC.

216.    A true and accurate excerpt from Casimir's sworn statement concerning the quid pro quo referral arrangement is depicted below:

15          Q.   When you were working at Innovo up to four

16    months ago, if you needed -- if you felt an MRI was

17    required, you would tell CXR this fact, correct --

18          A.   No.

19          Q.   Well, if Wellness sent you a record, right,

20    it would come through CXR, correct?

21          A.   Yes.

22          Q.   And then you would fill out your feelings

23    about this patient and what this patient needs on

24    your record, correct?

*     *     *

```
 1        A.    Uh-huh.
 2        Q.    And then you would send it back to CXR?
 3        A.    Okay.
 4        Q.    Is that right?
 5        A.    Yes.
 6        Q.    And I'm assuming, in some cases -- you
 7    could correct me if I'm wrong -- you thought it was
 8    a good idea for an MRI to be done; is that right?
 9        A.    Yes.  That's possible, yes.
10        Q.    And that reference would go to CXR,
11    correct?
12        A.    Correct.  Whoever referred that patient.
```

217.    Such conduct is improper and unlawful, and any billing submitted to Allstate based on these referral arrangements was fraudulent.

**c.    _Huynh/Le Referrals_**

218.    With the aforementioned payments it received from IPS, on information and belief, CXR, HRX and/or Innovo Management paid kickbacks to the chiropractic businesses, 290 Pain and 59 Pain.

219.    In exchange, Huynh and Le referred their patients to IPS and Breeze MRI by way of CXR.

220.    A true and accurate excerpt from An's sworn statement discussing referrals from 290 Pain is below:

30

> 2    Q.   Okay.  Again, I apologize if I asked this.
> 3  I just want to make sure it's clear in my mind.  You
> 4  say you may have received referrals from 290, but it
> 5  would go through Deepak and Ravi before it got to you?
> 6    A.   Right.

221.    Huynh and Le owned and operated a network of businesses in Texas.  The entities that comprise the network include 290 Pain, 59 Pain, and 2015 Jones Investment (hereinafter referred to collectively as the "Huynh/Le businesses").

222.    On information and belief, the Huynh/Le businesses share common bank accounts, management, employees, and practices and procedures.

223.    Huynh and Le's business, 290 Pain, is a chiropractic clinic that is located at 10694 Jones Road, Suite 107, Houston, Texas, 77065 ("290 Pain location").

224.    Huynh and Le's business, 59 Pain, is also a chiropractic clinic that is located at 7149 Southwest Freeway, Houston, Texas, 77566 ("59 Pain location").

225.    Huynh and Le's business, 2015 Jones Investment ("2015 Jones"), is a real estate business. Its primary place of business in Suite 110 of the 290 Pain location.

226.    On information and belief, Huynh and Le formed 2015 Jones to obfuscate that they were the true owners of the 290 Pain location, and to disguise kickback, cross-referrals, and profit sharing payments from IPS, and others, as rent.

227.    Huynh, through the business, 2015 Jones, owns the building located at the 290 Pain location.

228.    According to Casimir, IPS leased Suite 107 in the 290 Pain location from 2015 Jones.

229.    On March 30, 2021, Casimir, on behalf of IPS, executed a lease agreement ("Innovo lease") with 2015 Jones for the *exclusive* use of Suite 110 (not suite 107) in the 290 Pain location from April 1, 2021 until the lease expired on April 30, 2024, for a total of $132,000.00.

230.    A true and accurate excerpt from the lease agreement is depicted below:

> Section 1. <u>Lease and Premises.</u>  Landlord, for and in consideration of the rents and agreements herein set forth, does lease exclusively to Tenant does rent from Landlord the building known as **10694 Jones Rd. Ste. 110, Houston, TX 77065** to be used as **Innovo Physicians Services. PLLC** pursuant to Section 10.

*     *     *

> Section 3. <u>Rent.</u>  Tenants shall pay Landlord as minimum rent for said Premises the sum of **ONE HUNDRED THIRTY TWO THOUSAND DOLLARS ($132,000.00)** payable as follow:
> - **April 1ˢᵗ, 2021 to March 30, 2022: $3,000.00**
> - **April 1ˢᵗ, 2022 to March 30, 2024: $4,000.00/month**

231.    According to Casimir, despite the language of the release,  IPS did not exclusively lease Suite 107 or Suite 110 from 2015 Jones as is suggested by the Innovo lease. Instead, IPS only subleased the Jones Road location a few days a month.

232.    In addition, IPS would occasionally rent office space at the Southwest location, which is where 59 Pain is located.

233.    A true and accurate excerpt from Casimir's sworn statement concerning the 290 Pain location is depicted below:

```
12      A.   Well, I only go there a couple times a
13   month, so I don't know what that space is being used
14   for when I'm not there.
15      Q.   Okay.  So it's sort of like -- you sublet
16   out -- you borrow a medical office to do your work?
17   It's sort of a shared space; is that what I'm
18   getting from you?
19      A.   Right.  I only pay for the amount of time
20   that we use there.
21      Q.   And how often do you rent that space or
22   lease that space?
23      A.   When we first started, when business was
24   slow, it was, I think, one Saturday a month.  And
```

\*     \*     \*

```
1   then as we progressed, we started doing two
2   Saturdays a month, and then we added on Thursdays.
```

234.    Based on the evidence obtained by Allstate during its investigation, the monthly payments IPS made to 2015 Jones of $3,000.00, and then, $4,000.00, after a year, as mandated by the Innovo lease, were issued at the direction of Sharma, and were for patient referrals disguised as rent payments.

235.     In exchange for the referral payments, Huynh, Le, 290 Pain and 59 Pain referred its patients to IPS by way of CXR, and ultimately to Breeze MRI.

236.     In return, IPS, An, and Casimir, would refer the patients back to 59 Pain and 290 Pain for additional medically unnecessary treatment.

237.     Such conduct is improper and unlawful, and any billing submitted to Allstate based on these referral arrangements was fraudulent.

### 2.     Unlawful Laypersons' Control of the Healthcare Providers

238.     Through caraccidentcares.com, Sharma publicly marketed that he has a "sound medical background" and that he is "a medical doctor" and was an "emergency services director for a busy state hospital in North India."

239.     In Texas, individuals and entities may not practice medicine unless they hold a license issued by the Texas Medical Board (the "Board"). Tex. Occ. Code § 155.001.

240.     Any misrepresentation by using letters or words, through marketing or any other manner that indicates a person, partnership, or corporation is licensed to practice medicine is an offense under Section 165.156 of the Medical Practices Act.

241.     Sharma is not licensed to practice medicine in the State of Texas.

242.     Sharma has no lawful authority to direct or control professional healthcare service providers or services.

243.     According to An, Sharma exercised supervisory responsibility over the staff, nurse practitioners, and physicians that worked at IPS.

244.     According to An, they (Casimir and An) gave Sharma authority and responsibility to hire and terminate employees and independent contractors that worked with IPS, including those who would not perform as he directed.

34

245.    Tex. Occ. Code § 164.052 provides as follows:

(a)  *A physician or an applicant for a license to practice medicine commits
     a prohibited practice if that person:*

\* \* \*

*(8) purchases, sells, barters, or uses, or offers to purchase,
sell, barter, or use, a medical degree, license, certificate, or
diploma, or a transcript of a license, certificate, or diploma
in or incident to an application to the board for a license to
practice medicine;*

\* \* \*

*(13) impersonates a physician or permits another to use the
person's license or certificate to practice medicine in this
state;*[and]

\* \* \*

*(17) directly or indirectly aids or abets the practice of
medicine by a person, partnership, association, or
corporation that is not licensed to practice medicine by the
board.*

246.    On information and belief, Sharma, and/or Innovo Management recruited Casimir
to be held out as an "owner" of IPS.

247.    On information and belief, Casimir next recruited An to join the scheme, and to
also be held out as an "owner" of IPS.

248.    On information and belief, An and Casimir were not the true owners of IPS—they
were owners in name only.

249.    On information and belief, Sharma, and/or Innovo Management, and/or the other
Sharma businesses owned and/or controlled IPS.

250.     At best, An and Casimir ceded control of IPS, its physicians, and nurse practitioners to Sharma, during the relevant time period, by way of Sharma's ownership and operation of Innovo Management, and/or the other Sharma businesses.

251.     At worst, An and Casimir were employees of IPS, and their medical decision-making was controlled, supervised, and directed by Sharma, and/or Innovo Management. As such, An and Casimir aided and abetted Sharma and/or Innovo Management in the unlawful practice of medicine.

252.     To further exact control of IPS,  Sharma, through HRX, entered an agreement with IPS for the exclusive option to purchase its account receivables.  As a condition of any sale, IPS agreed to execute a boilerplate Notice of Sale Assignment to alert patients, attorneys and other third parties that HRX was assigned the patients' file.  By the terms of the agreement and Notice, HRX marginalized Casimir and An, and assumed complete control of the operation of IPS and its employees, including verification of treatment and billing, and control over Casimir and An's appearances at depositions concerning the same.

253.     A true and accurate excerpt from the Notice of Sale Assignment that was executed by Casimir is depicted below:

Dear Ladies and Gentlemen:

Please be advised that we have assigned to HRX Investments, Inc. ("**HRX**") the account receivable ("**Account**") owed by Patient to us regarding our services related to the Procedure. Accordingly, all future inquiries, correspondence and payments concerning the Account and any and all future correspondence; affidavits; and inquiries, balance verifications, billing record requests, subpoenas, depositions upon written questions, oral deposition notices, interrogatories, motions to compel, and/or any other attempts to discover information pertaining to the Account shall be made or sent, as applicable, to Company within twenty four (24) hours of receipt or notification of any such documentation, inquiry, or request.

Thank you.

**Innovo Physician Services, PLLC**

By: _____
   **Robert Casimir Manager**

254.    Sharma and/or Innovo Management recruited and installed licensed medical professionals, including nurse practitioners to misrepresent to the public, including Allstate, that IPS was properly operated by licensed professionals to circumvent Texas law prohibiting the lay practice of medicine.

255.    Sharma, An, Casimir, and IPS misrepresented that Innovo Management was an independent contractor hired by IPS to run the administrative portion of the IPS practice.

256.    In truth, Innovo Management was created by Sharma with the intent to skirt Texas regulations prohibiting the corporate practice of medicine. *See* Tex. Occ. Code § 164.052(a)(17).

257.    Sharma's role at Innovo Management was not limited to providing administrative, managerial, or referral services to IPS—Sharma, in fact, controlled the treatment protocol administered by providers at IPS, and was directly involved in medical decision-making.

258.    When a corporation or layperson engages in practices such as collecting fees for medical services, hiring and firing doctors, and making important clinical decisions, it is as if the physician is allowing the corporation to unlawfully use their medical license. Tex. Occ. Code § 164.052(a)(17) ; *see Flynn Bros., Inc,* 715 S.W.2d 782, 785 (Tex. App. – Dallas 1986).

259.    Notably, Innovo Management utilized the Jones Road location (IPS's location) for its principal executive office – rent free.

260.    Sharma, through Innovo Management and HRX, and/or Patel, through CXR, treat An and Casimir as employees. Sharma through Innovo Management and HRX, and/or Patel through CXR dictated the amount An and Casimir were to be paid by IPS per patient (which was a mere fraction of the amount billed to Allstate and retroactively extracted and retained by the non-professional Defendants).

261.    A true and accurate excerpt from An's sworn statement concerning Sharma and Patel's practice of paying IPS' physicians is depicted below:

> Q.   So when you were working at Innovo, how would you personally get paid?  Were you paid as an employee, as an independent contractor?
>
> A.   That's a little bit weird too because I guess the way it works is, like, we would -- some patients -- in the very beginning, we were just getting paid per injection.  Then later on, depending on, like, the patient referrals, like, we would be getting paid more than 250 or -- it kind of varied.  I never quite understood why that varied. I know one reason why it varied is because sometimes they would say that these cases were, like, prepaid. If it was prepaid, then I know we would make some

\*       \*       \*

> type of fixed amount per injection.  Beyond that, I don't know.

262.    A true and accurate excerpt from Casimir's sworn statement concerning CXR's practice of paying IPS' physicians is depicted below.

Q.   And you would then examine the patients,
consult with the patients, and then make referrals
for the patients; is that correct?

A.   Sounds right.

Q.   And then you would charge CXR for that
service?

A.   Correct.

Q.   And you would be paid by CXR?

A.   Correct.

Q.   Okay.  And how much would CXR -- how much
would you charge CXR?

A.   So I guess it depends on which patients
they -- or how they got the patients.

*       *       *

So I think at the beginning we were getting
paid a fixed rate.  I think it was $200 -- or, like,
$300 or $400 per patient.  But then we converted
that to a percentage of the settlements on the
cases.

Q.   And what would that percentage be?

A.   I think it changed from -- it kept
changing.  Anywhere from 50 percent to 75 percent of
the settlement.

Q.   So just so I'm clear on this, would it be

*       *       *

> 50 percent of the fees you charged or 50 percent of
> whatever they were awarded?
>
>     A.    Whatever CXR was awarded by the attorneys,
> because I think -- they negotiate whatever they get
> paid by the attorneys.
>
>     Q.    Okay.  So if I'm understanding correctly,
> and again, please correct me if I'm wrong, after a
> case settled, CXR got some sort of percentage, and
> then you got 50 percent of whatever their percentage
> was?
>
>     A.    Yes.

263.    Moreover, Sharma, through Innovo Management and HRX, and/or Patel, through CXR, dictated how much IPS would charge for services.

264.    Sharma and/or Innovo Management created and controlled the predetermined treatment protocol utilized at IPS.

265.    An confirmed that it was Sharma, rather than a licensed medical professional, that ultimately decided the type of treatment a patient would receive at IPS.

266.    A true and accurate excerpt from An's sworn statement concerning Sharma's unlawful control over the clinic's medical decision-making, as it pertains to ordering and administering pain injections, is depicted below:

13    Q.  Who would approve or not approve of
14  injections to patients?
15    A.  I guess the lawyers.
16    Q.  So if you felt Patient A needed an
17  injection, who would you relay that information to?
18    A.  I would tell the head office lady.  Then
19  she would -- I guess she kind of had the information
20  of what they were approved for or what they were not
21  approved for.
22    Q.  Who was the head office lady?
23    A.  I just know the first name is Zulema.

\*       \*       \*

2    Q.  Who did she work for?
3    A.  Deepak.
4    Q.  Okay.  So after you examined a patient that
5  was sent over by Deepak, whatever your decision was
6  in going forward with treating this patient, you
7  would relay that information to Zulema?
8    A.  That's correct.
9    Q.  And then Zulema would say, This Patient A
10  has been preapproved for injections, or whatnot?
11    A.  Correct.
12    Q.  If they had not been preapproved, you had
13  to wait to hear back from Deepak through Zulema; is
14  that correct?
15    A.  I mean, I could also talk to Deepak
16  directly.  It just depends if he was in the office
17  that day or not.
18    Q.  How often would he come into the office?
19    A.  Pretty regularly.
20    Q.  Okay.  So ultimately whether or not you
21  were going to give a patient an injection would be
22  up to Deepak?
23    A.  Yes.

267.    Not only did Sharma and/or Innovo Management control the treatment purportedly rendered by An and Casimir, and the nurse practitioners hired to work at IPS, but he specifically targeted patients based upon their financial viability and reimbursement potential, rather than any determination of patient need.

268.    The Defendants, Casimir, An, Sharma, and Patel intentionally obfuscated this fact from Allstate, and others because they knew that Allstate would not have paid the claims had it known that IPS was unlawfully operated by a layperson and layperson corporations.

269.    Allstate only discovered Sharma and the Sharma's businesses' unlawful control of IPS after interviewing Defendants, Casimir and An, in August of 2024, and September of 2024, respectively, in connection with a collateral lawsuit, *Allstate Insurance Company et al. v. Wellness Pain & Associates, Inc. et al.*, Case No. 4:24-cv-02091, (S.D. Tex)

270.    Allstate would not have issued any payments had it known that IPS was controlled and operated by Sharma, and the Sharma businesses.

271.    Sharma and/or Innovo Management, as set out above, unlawfully controlled the treatment protocol that the referred patients purportedly received.

272.    Such conduct is improper and unlawful, and any billing submitted to Allstate purportedly rendered at IPS was fraudulent.

**C.    FRAUDULENT BILLING PRACTICES**

273.    Section 105.002 of the Texas Occupations Code concerns unprofessional conduct. It prohibits a healthcare provider, in connection with the providers professional activities, from knowingly presenting (or causing to be presented) a false or fraudulent claim for the payment of a loss under an insurance policy.  It further prohibits a healthcare provider, in connection with its professional services from knowingly preparing, making, or subscribing to any writing, with the

intent to present or use the writing, or allow it to be presented or used, in support of a false or fraudulent claim under an insurance policy. Tex. Occ. Code § 105.002(a)(1)-(2).

274.    The Defendants regularly submitted bills to Allstate seeking payment for treatment and services that were (1) medically unnecessary; (2) unreasonable; and (3) not rendered as represented to patients at issue herein.

### 1.    Billing for Services That Were Not Medically Necessary

275.    To maximize their financial gain, the Defendants adhered to a predetermined protocol of unnecessary, indiscriminate, and fraudulent treatment and testing, that lacked individualized treatment goals, as discussed more fully below.

276.    Instead of healing Allstate claimants, the Defendants' goal was to bill for as much treatment and testing as possible, regardless of whether such treatment and testing was reasonably necessary to patients' care, recovery, rehabilitation, and/or arose out of an alleged motor vehicle accident, to generate bills to Allstate.

277.    Section 101.203 of the Texas Occupations Code mandates that health care professionals may not violate Section 311.0025, Health & Safety Code. Tex. Occ. Code § 101.203 (West 2012). Section 311.0025(a) consists of the following prohibition:

> A hospital, treatment facility, mental health facility, or health care professional may not submit to a patient or a third party payor a bill for a treatment that the hospital, facility, or professional knows was not provided or knows was improper, unreasonable, or medically or clinically unnecessary.

Tex. Health & Safety Code Ann § 311.0025(a) (West 2012).

278.    The Defendants violated Section 101.203 by submitting charges for medical treatment they knew was improper, unreasonable and medically unnecessary.

279.    The Allstate claimants purportedly treated by the Defendants routinely sustained soft-tissue type injuries and had no objective deficits to substantiate the predetermined treatment protocols, which included referrals for excessive testing, repeated treatments, and procedures that the Allstate claimants did not need. These treatments were utilized broadly and indiscriminately, without regard for presenting complaints, noted progress, patient age, diagnosis or severity.

280.    The Defendants' predetermined treatment protocol violated standards of care for the medical community, and the examinations, consultations, chiropractic and physical therapy services, diagnostic testing, and procedures, performed by 59 Pain, 290 Pain, Breeze MRI, and IPS were medically unnecessary and performed, to the extent they were performed as represented, solely for the financial benefit of the providers, without basis or adequate substantiation.

281.    The American Medical Association defined medical necessity as: "Healthcare services or products that a prudent physician would provide to a patient for the purpose of preventing, diagnosing or treating an illness, injury, disease, or symptoms in a manner that is (a) in accordance, with generally accepted standards of medical practice; (b) clinically appropriate in terms of type, frequency, extent, site, and duration; and (c) not primarily for the economic benefit of the health plans and purchasers or for the convenience of the patient, treating physician, or other health care provider," (Institute of Medicine, Committee on Defining and Revising an Essential Health Benefits Package for Qualified Health Plans (2011)).

282.    The Defendants records are cursory, incomplete, and conflicting. Additionally, there is no meaningful assessment of patient response to the physical therapy or injections, nor is there any alteration of treatment following these interventions or diagnostic testing.

283.    In sum, the totality of the purported care provided to the patients of 59 Pain, 290 Pain, Breeze MRI, and IPS was medically unnecessary, unsubstantiated, excessive, and duplicative.

284.    If treatment is not required for a patient's care, recovery, or rehabilitation, such treatment is not medically necessary, and therefore, non-compensable.

285.    Allstate is not required to pay the Defendants for treatment that was medically unnecessary, and it is entitled to the return of money paid as a result of the Defendant's fraud.

286.    The full extent of the Defendants' misrepresentations regarding the (lack of) lawfulness and necessity of the treatment they billed was not known to Allstate until it undertook the full investigation that culminated in the filing of this action.

a.    ***Unnecessary Services at 59 Pain and 290 Pain***

287.    The pattern of treatment instituted by the Defendants invariably commenced when Allstate claimants were referred to either 59 Pain or 290 Pain for an initial evaluation by a chiropractor, usually within a week of the purported motor vehicle accident.

288.    In addition to obfuscating the improper and unlawful referral agreement Le, Huynh, 59 Pain and 290 Pain participated in with Sharma, the Sharma businesses, Patel and the Patel businesses, 59 Pain and 290 Pain submitted records and bills to Allstate for services they knew were not medical necessary.

289.    Getting a 59 Pain or 290 Pain patient to start and comply with the predetermined treatment protocol allowed the Defendants to fabricate a false foundation for the delivery of prolonged and unnecessary services. In fact, Allstate claimants were often instructed by Defendants Le and Huynh to commence physical therapy at 59 Pain or 290 Pain, respectively, on the same day as their initial examination to quickly generate substantial bills.

290.    The prescription of physical therapy also helped propel the scheme because the excessive treatment protocol created a false impression of the patients' actual injuries.

291.    The physical therapy treatment protocol also generated a steady stream of revenue for 59 Pain and 290 Pain because patients were given the same treatment plans, which called for numerous office visits over many weeks.

292.    The initial assessment reports generated by Le and Huynh, through 59 Pain and 290 Pain, and submitted to Allstate are remarkably similar for almost every patient. These assessments routinely concluded with 59 Pain or 290 Pain reporting a virtually identical plan of care for each patient.

293.    59 Pain and 290 Pain's records relied on templated check-box notes, and treatment plans that lacked support, clear goals, objective measurements of functional loss or follow-up re-assessments of the effectiveness of their prescribed treatment plan.

294.    This plan involved a referral for unnecessary physical therapy services, which included the applications of heat and ice, electric muscle stimulation (EMS), and ultrasound.

295.    These services, purportedly provided through 59 Pain and 290 Pain to Allstate claimants were billed using Current Procedural Terminology ("CPT") codes.

296.    CPT codes are published annually by the American Medical Association ("AMA") to facilitate the efficient processing of medical charges by insurance carriers and other private and governmental health care payors.

297.    59 Pain and 290 Pain failed to submit codes that truthfully identified the services purportedly performed.

298.    In regard to the application of heat and ice, 59 Pain and 290 Pain billed Allstate claimants $40.00 under CPT code 97010.  The modality is a self-care treatment to reduce physician

47

dependence and improve outcomes. The records submitted by 59 Pain and 290 Pain in all referenced cases in the Complaint and its attached exhibits fail to document that medical supervision of this service was necessary. Therefore, in office heat and ice is not medically necessary.

299. All cases where 59 Pain and 290 Pain billed Allstate claimants under CPT code 97010, the charges are fraudulent, including those identified in Exhibit 2.

300. 59 Pain and 290 Pain also billed Allstate claimants $55.00 for electrical muscle stimulation ("EMS") under CPT code 97032. This services requires documentation of manual EMS treatment using a handheld probe requiring constant one-on-one attendance. 59 Pain and 290 Pain's records never support the clinical need for constant attendance. They also never indicate the settings used, what body part was treated, or the Allstate claimant's response to the therapy. Pre-templated times, using a multiplier, or circling a number of units lacks encounter specific information and is not sufficient to support medical necessity.

301. All cases where 59 Pain and 290 Pain billed Allstate claimants under CPT code 97032, the charges are fraudulent, including those identified in Exhibit 3.

302. In addition, 59 Pain and 290 Pain also billed Allstate claimants $55.00 for ultrasound under CPT code 97035. Ultrasound is a time-based service requiring documentation of direct one-on-one constant attendance for 15 minutes per united billed. 59 Pain and 290 Pain's records never document the settings used, what body part was treated, or the Allstate claimants' response to the therapy. Pre-templated times, using a multiplier, or circling a number of units lacks encounter specific information and is not sufficient to support medical necessity.

303. All cases where 59 Pain and 290 Pain billed Allstate claimants under CPT code 97035, the charges are fraudulent, including those identified in Exhibit 4.

304.    59 Pain and 290 Pain also billed Allstate claimants $65.00 for chiropractic manipulation under CPT code 98940, routinely without documenting joint disfunction to support the need of the service. 59 Pain and 290 Pain's records do not identify the area the service was purportedly administered.   They also never indicate the settings used, what body part was treated, or the Allstate claimant's response to the therapy. Pre-templated times, using a multiplier, or circling a number of units lacks encounter specific information and is not sufficient to support medical necessity, the technique used, or the Allstate claimants' response to the service on the dates billed.

305.    All cases where 59 Pain and 290 Pain billed Allstate claimants under CPT code 98940, the charges are fraudulent, including those identified in Exhibit 5.

306.    Huynh and Le intentionally failed to tailor their chiropractic/physical therapy treatments to the individualized conditions of patients.

307.    These physical therapy services were then repeated many times to each patient without the Defendants attempting to make any determination as to whether the purported treatment benefited the patients.

308.    There was a complete lack of encounter-specific details to substantiate the medical treatments prescribed and purportedly rendered, let alone to substantiate routine referrals for diagnostic testing at Breeze MRI and pain management consultations at IPS, often without a documented order.

309.    Neither the results of the X-rays nor MRIs, performed at Breeze MRI, nor the consultations, performed at IPS, as a result of their improper and unlawful referrals had any bearing on the physical therapy treatment protocol that was already prescribed.

310.    In order to falsely justify the excessive and unnecessary physical therapy prescribed, and purportedly performed at 59 Pain and 290 Pain, Le and Huynh routinely diagnosed patients with inflammation, radiating pain and muscle spasms in either the cervical, thoracic and/or lumbar region, which were vague and non-specific diagnoses without documented medical findings, that were designed only to create the appearance of necessity for the treatment billed by the Defendants.

311.    Indeed, the assessment form used by 59 Pain and 290 Pain to document purported "evaluations" included pre-printed checkboxes that left its chiropractors no choice but to order physical therapy modalities for every patient, as documented below:



312.    The Defendants submitted fraudulent bills to Allstate for unnecessary physical therapy.

313.    Allstate is not required to pay the Defendants for chiropractic and physical therapy treatment that was medically unnecessary, and it is entitled to the return of money paid as a result of the Defendant's fraud.

314.    Such conduct is improper and unlawful, and any billing submitted to Allstate based on the aforementioned services was fraudulent..

50

315.    All of the fraudulent documentation for physical therapy/chiropractic treatment that was allegedly provided to Allstate claimants was sent through the U.S. Mail to Allstate, Allstate claimants and/or their attorneys. Allstate relied upon the same to determine payments made in connection with the Defendants' billing.

**b.    _Unnecessary Services at Breeze MRI_**

316.    As part of the scheme, and at the direction of Sharma and Patel, Le and Huynh, 59 Pain and 290 Pain routinely referred Allstate claimants for diagnostic testing, without clinical indicators to support the necessity, to Breeze MRI, regardless of whether the referrals, or diagnostic testing was medically necessary.

317.    MRI test results were often inappropriately used to justify overtreatment, including invasive pain management procedures rendered at IPS.

318.    Indeed, the assessment form used by 59 Pain and 290 Pain to document visits had a pre-printed checkbox that left its chiropractors no choice but to routinely order MRIs.

319.    A true and accurate example of the MRI checkbox from the records of 59 Pain and 290 Pain is depicted below:



320.    Patel and Breeze MRI guaranteed that participating providers, like Le and Huynh, would automatically send prescriptions to Breeze MRI by providing the participating providers with pre-printed order forms.

321.     Le and Huynh routinely used the pre-printed orders supplied to them by Breeze MRI.

322.     A true and accurate example of the preprinted Breeze MRI order signed by Le is depicted below:



323.     Le and Huynh, through 59 Pain and 290 Pain, routinely engaged in a pattern of ordering MRIs that were medically unnecessary, and/or without legitimate documented clinical indications.

324.     Indeed, within four to six weeks of starting treatment, Le and Huynh routinely directed Allstate claimants to undergo diagnostic testing, such as an MRI.  On information and belief, to support the order, and to conceal the referral scheme, Le and Huynh falsely reported that Allstate claimants undergoing treatment had suddenly started to experience radiating pain – when there was no documentation in their records of subjective or objective radiating pain prior to the day of the referral.

325.     The MRI reports routinely identified disc herniations and "abnormal straightening of the normal cervical spine curvature, suggesting muscle spasms" as a mechanism to support unnecessary injections administered at IPS.

326.     As a result of the unnecessary referrals, courtesy of Le and Huynh, Patel, through Breeze MRI, engaged in a pattern of submitting charges for MRIs that were unlawful, unreasonable and medically unnecessary.

327.     Patel and Breeze MRI's bad acts, however, did not stop when it charged excessive rates for medically unnecessary diagnostic testing.  Indeed, with the scheme's predetermined treatment protocol in place, in instances when Le and Huynh had not yet ordered diagnostic testing, Patel, through Breeze MRI, routinely directed unidentified Breeze MRI employees to conduct diagnostic testing on Allstate claimants that CRX referred to 59 Pain and 290 Pain without documented physician/chiropractic orders.

328.     Section 194.22 of the Texas Administrative Code concerns unprofessional conduct. It prohibits those in the business of medical radiologic technology from knowingly "making any misleading, deceptive, or false representations in connection with services rendered."  It further prohibits the performance of a procedure on a patient "which has not been authorized by a practitioner." 22 Tex. Admin. Code § 194.22(d)(1), (3).

329. In fact, to conceal that the diagnostic testing was not ordered by a medical provider, as discussed below, Breeze MRI falsely reported in its invoices and records that Le or Huynh referred the patient to Breeze MRI.

330. The representative examples set forth below show that Breeze MRI engaged in an improper and unlawful referral arrangement through 59 Pain and 290 Pain.

**Claimant: A.H.**
**Claim No. 0667434880**
**DOL: 4/26/2022**

331. On April 26, 2022, Allstate claimant A.H. was involved in a motor vehicle accident. As a result, A.H. purportedly experienced lower back pain. Based on the evidence set forth in the complaint, Patel and/or Sharma, and/or their businesses referred A.H. for treatment at 290 Pain.

332. On May 5, 2022, A.H. consulted with Huynh. After a cursory examination, Huynh directed A.H. to commence the predetermined treatment protocol, which included multiple visits to 290 Pain, and visits to IPS.

333. Before Huynh ordered MRI testing to be performed at Breeze MRI, as was predetermined, on or around July 6, 2022, Patel directed an employee of Breeze MRI, who was neither identified by name nor licensure, on any records, to conduct an MRI of A.H.'s lumbar spine region despite the fact that it was not ordered or prescribed by a medical provider.

334. Even though Huynh did not order the MRI for A.H., Breeze MRI falsely reported that Huynh was the referring provider on its invoice seeking $3,600.00 for an MRI of the lumbar spine.

335. A true and accurate depiction of the Breeze MRI invoice applicable to A.H., juxtaposed with 290 Pain's assessment form without the MRI order being checked (highlighted in the rectangle), is below:



336.    Neither Huynh nor anyone employed at 290 Pain, Breeze MRI, or IPS told A.H. about the referral arrangement between the Defendants.

337.    Neither Huynh nor anyone employed at 290 Pain, Breeze MRI, or IPS told A.H. how much Breeze MRI would charge for the MRI.

338.    The Defendants fraudulently billed A.H. for diagnostic testing that was not administered as represented, unlawful, unreasonable, medically unnecessary, and in violation of Texas law.

339.    All of the fraudulent documentation for diagnostic testing that was allegedly provided to A.H. was sent through the U.S. Mail.

340.    This example of fraudulent conduct is not an isolated incident.

341.    The treatment allegedly provided to A.H. was improper and unlawful, and any billing submitted to Allstate based on these referral arrangements was fraudulent.

**Claimant: G.H.**
**Claim No. 0673715520**
**DOL: 6/15/2022**

342.    On June 15, 2022, Allstate claimant G.H. was involved in a motor vehicle accident. As result, G.H. purportedly experienced neck and lower back pain, and headaches. Based on the evidence set forth in the complaint, Patel and/or Sharma, and/or their businesses referred G.H. for treatment at 290 Pain.

343.    On June 20, 2022, G.H. purportedly consulted with Huynh, who prescribed G.H. the aforementioned predetermined treatment protocol, which included multiple visits to 290 Pain, and visits to IPS.

344.    Before Huynh ordered MRI testing to be performed at Breeze MRI, as was predetermined, on or around August 21, 2022, Patel directed an employee of Breeze MRI, who is neither identified by name or licensure, on any records, to conduct an MRI of G.H.'s cervical and lumbar spine regions despite the fact that it was not ordered or prescribed by a medical provider.

345.    Even though Huynh did not order the MRI for G.H., Breeze MRI falsely reported that Huynh was the referring provider on its invoice seeking $7,200.00 for an MRI of the cervical and lumbar spine regions.

346.    A true and accurate depiction of the Breeze MRI invoice applicable to G.H., juxtaposed with 290 Pain's assessment form without an MRI order or referral (highlighted in the rectangle), is below:



347.    Neither Huynh nor anyone employed at 290 Pain, Breeze MRI, or IPS told G.H. about the referral arrangement between the Defendants.

348.    Neither Huynh nor anyone employed at 290 Pain, Breeze MRI, or IPS told G.H. how much Breeze MRI would charge for the MRI.

349.    The Defendants fraudulently billed G.H. for diagnostic testing that was not administered as represented, unreasonable, medically unnecessary, and in violation of Texas law.

350.    All of the fraudulent documentation for diagnostic testing that was allegedly provided to G.H. was sent through the U.S. Mail, and Allstate relied upon the same in adjusting the claims.

351.    Allstate was not (or is not) required to pay Breeze MRI for the unlawful and fraudulent consultations billed for by Breeze in connection with G.H.

352.    The treatment allegedly provided to G.H. was improper and unlawful, and any billing submitted to Allstate based on these referral arrangements was fraudulent.

**Claimant: M.O.**
**Claim No. 0642605554**
**DOL: 9/20/2021**

353.    On September 20, 2021, Allstate claimant M.O. was involved in a motor vehicle accident. As result, M.O. purportedly experienced neck, chest, and lower back pain. Based on the evidence set forth in the complaint, Patel and/or Sharma, and/or their businesses referred M.O. for treatment at 59 Pain.

354.    The following day, on September 21, 2022, M.O. purportedly consulted with Le, who prescribed M.O. the aforementioned predetermined treatment protocol, which included multiple visits to 290 Pain, and visits to IPS.

355.    Before Le ordered MRI testing to be performed at Breeze MRI, as was predetermined, on or around December 6, 2021, Patel directed an employee of Breeze MRI, who is neither identified by name or licensure, on any records, to conduct an MRI of M.O.'s cervical and lumbar spine regions despite the fact that it was not ordered or prescribed by a medical provider.

356.    Even though Le did not order the MRI for M.O., Breeze MRI falsely reported that Le was the referring provider on its invoice seeking $7,200.00 for an MRI of the cervical and lumbar spine regions.

357.    A true and accurate depiction of the Breeze MRI invoice applicable to M.O., juxtaposed with 290 Pain's assessment form without the MRI order being checked (highlighted n the rectangle), is below:



358.    Neither Le nor anyone employed at 290 Pain, Breeze MRI, or IPS told M.O. about the referral arrangement between the Defendants.

359.    Neither Le nor anyone employed at 290 Pain, Breeze MRI, or IPS told M.O. how much Breeze MRI would charge for the MRI.

360.    The Defendants fraudulently billed M.O. for diagnostic testing that was not administered as represented, unreasonable, medically unnecessary, and in violation of Texas law.

361.    All of the fraudulent documentation for diagnostic testing that was allegedly provided to M.O. was sent through the U.S. Mail, and Allstate relied upon the same in adjusting the claims.

362.    Allstate was not (or is not) required to pay Breeze MRI for the unlawful and fraudulent consultations billed for by Breeze in connection with M.O.

363.    The treatment allegedly provided to M.O. was improper and unlawful, and any billing submitted to Allstate based on these referral arrangements was fraudulent.

### c.    *Unnecessary Services at IPS*

364.    As part of the scheme, and at the direction of Sharma and Patel, and/or Le and Huynh, through their respective businesses, Allstate claimants were routinely referred for further evaluation at IPS, regardless of whether the referrals, and consultations were medically necessary.

365.    The scheme was further fueled by the consultations purportedly performed on Allstate claimants by the participating physicians, An and Casimir, or nurse practitioners hired by Sharma.

366.    The consultations misrepresented and omitted material facts about the nature and extent of the consultations.

367.    Based upon the evidence gathered during Allstate's investigation, the participating physicians, including An and Casimir, predominantly used these consultations to fabricate reasons to prescribe unnecessary services, such as cervical and lumbar epidural steroid injections ("ESI").

368.    The decision to provide injections was predetermined—the Defendants intended to bill for ESI services at IPS before the patient was even given a pain management evaluation.

369.    The Defendants' practice of pressuring patients to submit to ESIs shortly after the claimed accidents, resulted in injections that were fraudulent and medically unnecessary.

370.    An and Casimir, through IPS, billed for ESI procedures frequently and without medical justification; in fact, An and Casimir repeatedly ordered and billed for repeat ESIs and other procedures even though there was no objective evidence showing effectiveness of the injections or improvement in the patients' condition following the injections.

371.    An and Casimir, through IPS, subjected Allstate claimants to ESIs regardless of their presenting complaints or diagnoses. Often the Allstate claimants who were purportedly treated with ESIs did not have subjective complaints that would warrant such injections.

372.    The ESIs and other procedures were excessive, unwarranted, and medically unnecessary because the condition of the Allstate claimants did not warrant invasive interventions.

373.    ESIs are not indicated treatments for every type of neck or back pain. The presence of a disc herniation by itself is not an indication for an ESI. Disc herniations are present in a high percentage of individuals who have no back or neck pain. ESIs have specific indications which depend on patient complaints, examination findings, and MRI findings.

374.    ESIs treat radicular pain, meaning pain that radiates down an arm or leg in a pattern that correlates with an involved spinal nerve root. Potential objective sources of nerve root involvement and radiculopathy on MRIs are nerve root compression, displacement, or neural foraminal stenosis. These findings without radiating pain do not support the presence of radiculopathy. The ESIs in these cases were performed or recommended without regard for these indications.

375.    The representative examples set forth below show that IPS performed medically unnecessary services on Allstate claimants.

**Claimant: J.C.**
**Claim No. 0710196519**
**DOL: 2/19/23**

376.    On February 19, 2023, Allstate claimant J.C. was purportedly involved in a motor vehicle accident. As a result, J.C. reported neck pain, lower back pain, and headaches.

377.    Based on the evidence set forth in the complaint, Patel and/or Sharma, and/or their businesses referred J.C. for treatment at 290 Pain. Within three days of the accident, J.C. purportedly consulted with Huynh.

378.    After a cursory examination, Huynh directed J.C. to commence the predetermined treatment protocol, which included multiple visits to 290 Pain for largely unnecessary passive modalities, MRI testing at Breeze MRI, and consultations at IPS.  As per the predetermined treatment protocol, MRIs of the lumbar and cervical spine areas was purportedly performed at Breeze MRI.  The record does not identify the individual that performed the MRI by name or credentials.

379.    On June 6, 2023, Nicole Mirra, FNP-C consulted with J.C. Pursuant to the predetermined treatment protocol, she directed J.C. to continue therapy at 290 Pain, and prescribed cervical and lumbar ESIs.

380.    A lumbar injection was never performed, which suggest J.C.'s lower back pain was relieved by conservative treatment – demonstrating that the prescription for a lumbar ESI was medically unnecessary.

381.    A cervical injection, however, was purportedly administered to J.C. at IPS on June 22, 2023, and again, on August 17, 2023.

382.    The cervical ESIs were not necessary. As setout, ESIs treat radiculopathy. Radiculopathy is supported when there are both objective findings of a potential source of radiculopathy on an MRI, such as nerve root compression, displacement, or neural foraminal stenosis, and consistently identified corresponding pain in the extremities associated with numbness, weakness, or altered reflexes in a pattern that matches the affected nerve root on the MRI.

383.    These injections were medically unnecessary as there was no identified corresponding pain in J.C.'s extremities associated with numbness, weakness, or altered reflexes in a pattern that matched an affected nerve root on the cervical MRI.  At best, the medical records submitted supported soft tissue sprain/strain injuries as a source of J.C.'s pain, which are not treated with ESIs.

384.    The Defendants fraudulently billed J.C. for ESIs that were not administered as represented, unreasonable, medically unnecessary, and in violation of Texas law.

385.    All of the fraudulent documentation for ESIs that were allegedly provided to J.C. was sent through the U.S. Mail, and Allstate relied upon the same in adjusting the claims.

386.    Allstate was not (or is not) required to pay IPS for the unlawful and fraudulent consultations billed for by IPS in connection with J.C.

387.    The treatment allegedly provided to J.C. was improper and unlawful, and any billing submitted to Allstate based on these referral arrangements was fraudulent.

**Claimant: S.A.**
**Claim No. 0700693385**
**DOL: 1/24/23**

388.    On January 24, 2023, S.A. was purportedly involved in a motor vehicle accident. As a result, she complained of neck pain, lower back pain, bilateral shoulder pain, occasional cramping in the right leg, dizziness, and headaches.

389.    Based on the evidence set forth in the complaint, Patel and/or Sharma, and/or their businesses referred S.A. for treatment at 290 Pain.

390.    Within two days of the accident, S.A. purportedly consulted with Huynh, who prescribed S.A. the aforementioned predetermined treatment protocol, which included multiple

visits to 290 Pain (for unnecessary passive modalities), an MRI at Breeze MRI (performed by an individual who is unidentified by name or licensure), and a pain consultation at IPS.

391.    On February 14, 2023, S.A. presented to IPS for a consultation performed by Nicole Mirra, FNP-C. Despite the fact that Mirra is a nurse practitioner, IPS represented that she was a medical doctor in her consultation report and invoice.  The unlawful practice of identifying nurse practitioners as medical doctors is discussed in greater detail below.

392.    As per the predetermined treatment protocol, Mirra directed the patient to continue chiropractic treatment at 290 Pain, and prescribed bilateral trapezius trigger point injections.

393.    An and Casimir, through IPS and the nurse practitioners hired by Sharma, routinely pushed ESIs and other procedures even though sufficient time had not elapsed since the patient's accident to permit the normal and expected minor pain and soreness from an accident to resolve, which is contrary to the accepted standard of care.

394.    The next appointment S.A. had with IPS was performed via telehealth on March 21, 2023. Despite S.A.'s report of improvement, and Mirra's inability to palpate or further test S.A. via telehealth, Mirra now prescribed cervical and lumbar ESIs. As per routine, the prescription was made when there was no identified corresponding pain in S.A.'s extremities associated with numbness, weakness, or altered reflexes in a pattern that matched an affected nerve root on the cervical MRI.  The only reason the prescription cervical and lumbar ESIs was made, was to increase profits.

395.    Unwilling to undergo the multiple procedures prescribed in light of her improvement under conservative care and the passage of time, S.A. self-discharged from any further treatment at IPS.

396.     At best, the medical records submitted for S.A. supported soft-tissue, sprain/strain injuries as a source of S.A.'s pain, which are not treated with epidural steroid injections.

**Claimant: A.C.**
**Claim No. 0685457160**
**DOL: 9/20/2022**

397.     On September 20, 2022, A.C. was purportedly involved in a motor vehicle accident. As a result, he purportedly experienced pain in his neck and back.  Based on the evidence set forth in the complaint, Patel and/or Sharma, and/or their businesses referred A.C. to IPS for consultations and injections.

398.     Within a week of the accident, A.C. presented at IPS for a consultation with Mirra. Again, despite Texas law, IPS misrepresented in the records and invoices that Mirra was a medical doctor when she is not.

399.     After a cursory examination, and pursuant to the aforementioned predetermined treatment protocol, Mirra directed A.C. to see a chiropractor, and prescribed medically unnecessary bilateral trapezius trigger point injections, which she administered that same day without the supervision of a medical doctor affiliated with the IPS practice as is mandated by Texas law. Nurse practitioner supervision requirements are discussed in further detail below.

400.     Not only must a nurse practitioner be registered with a physician, they are limited to practicing at the physician's designated office.  The records and bills submitted by IPS for the purported services are routinely devoid of any information that identifies the location of where the procedures were performed.

401.     An and Casimir, through IPS and the nurse practitioners hired by Sharma, prescribed, ordered, and performed injections on Allstate claimants before the Allstate claimants had an opportunity to respond to conservative treatment.

402.     On March 1, 2023, without a documented explanation for the gap in treatment of six months, A.C. returned to IPS.  After another cursory examination, Mirra prescribed a medically unnecessary lumbar ESI.  Pursuant to the predetermined treatment protocol, the prescription was made when there was no identified corresponding pain in A.C.'s extremities associated with numbness, weakness, or altered reflexes in a pattern that matched an affected nerve root on the cervical MRI.  The prescription was made to increase profits only.

403.     On March 18, 2023, An administered the lumbar injection.  While An represented that he reviewed the MRI findings from Breeze MRI and A.C.'s symptoms, he did not review Mirra's records.

404.     The Defendants submitted fraudulent bills to Allstate for unnecessary consultations and injections. Allstate was not (or is not) required to pay IPS for the unlawful and fraudulent consultations billed for by IPS.

405.     All of the fraudulent documentation for ESIs that were allegedly provided to A.C. was sent through the U.S. Mail, and Allstate relied upon the same in adjusting the claims.

406.     Allstate was not (or is not) required to pay IPS for the unlawful and fraudulent consultations billed for by IPS in connection with A.C.

407.     The treatment allegedly provided to A.C. was improper and unlawful, and any billing submitted to Allstate based on these referral arrangements was fraudulent.

### 2.     Fraudulent Billing for Services Purportedly Administered by Nurse Practitioners

408.     The pain management services and procedures purportedly performed at IPS were profitable because Sharma, An and Casimir, through Innovo Management and/or IPS hired nurse practitioners who purportedly examined patients at IPS's four locations.

409.    As part of the predetermined treatment protocol, the nurse practitioners routinely recommended that the patients they examined on behalf of IPS undergo an injection procedure, which was ultimately administered by either An or Casimir.

### a.    *Improper Supervision of Nurse Practitioners*

410.    IPS, however, billed for the pain management consultations purportedly performed by nurse practitioners when they were not registered with the Texas Medical Board as being supervised by An and Casimir.

411.    IPS also billed for pain management consultations when the nurse practitioners were not actually supervised by An and/or Casimir.

412.     In Texas, physicians and nurse practitioners seeking their supervision must adhere to specific registration requirements to be compliant with state regulations. Texas regulations do not permit independent practice.

413.    Physicians must register all nurse practitioners they intend to supervise before the nurse practitioners can begin working with the physician.

414.    Once registered, nurse practitioners are required to be supervised by a licensed physician.

415.    Supervision does *not* require the constant physical presence of the supervising physician "but includes a situation where a supervising physician and the person being supervised are, or can easily be, in contact with one another by radio, telephone, or another telecommunication device." 22 Tex. Admin. Code § 185.2.

416.    It is considered unprofessional and/or dishonorable conduct for a physician to fail to "supervise adequately the activities of those acting under the supervision of the physician." Tex. Occ. Code § 164.053(a)(8).

417.    An and Casimir were obligated by Texas law to register and supervise the nurse practitioners contracted to work at IPS who performed medical consultations, but failed to do so.

418.    An and Casimir utilized multiple nurse practitioners so they could bill more services to more patients.  The IPS nurse practitioners included Jacqueline Mathis, APRN NP-C, Mary Vallesteros, NP, Yaima Martinez Gonzalez, NP, and Nicole Mirra, FNP.

419.    Based on information provided to Allstate by the Texas Medical Board, Mathis, Vallesteros, and Gonzalez were never registered to administer services to patients of An and Casimir at the 290 Pain location.  As for Mirra, she was not registered by Casimir with the Texas Medical Board until January 1, 2023.  Mirra, however, routinely treated Allstate claimants prior to being registered.

420.    A true and accurate copy of Mirra's registration from the Texas Medical Board is depicted below:



See https://profile.tmb.state.tx.us/PublicProfile.aspx?981620d2-5bf7-40d9-81cb-77c9bed563df.

421.    An and Casimir's willingness to flout their responsibility to register nurse practitioners purportedly examining patients at IPS and to bill for treatment that was unreasonable and medically unnecessary further supports the allegation that neither of them actually supervised the nurse practitioners.

422.    Based on information obtained by Allstate during its investigation, neither An nor Casimir reviewed and or signed any of the consultation reports purportedly created by the nurse practitioners that were submitted to Allstate.

423.    Neither An nor Casimir reviewed the invoices purportedly created to bill for the nurse practitioners consultations of Allstate claimants.

424.    Based on the information obtained by Allstate during its investigation, An and Casimir did not supervise the nurse practitioners. Instead, Sharma hired and supervised the nurse practitioners who contracted with IPS and/or Innovo Management.

425.    A true and accurate excerpt from An's sworn statement concerning the hiring of nurse practitioners at IPS is set forth below:

> 13    Q.  Who would hire the nurse practitioners for
> 14 Innovo?
> 15    A.  Deepak.
> 16    Q.  Okay.  As far as you knew, he would locate,
> 17 find and retain all nurse practitioners you guys
> 18 used at Innovo; is that right?
> 19    A.  Yes.

426.    Multiple evaluations, performed by unsupervised nurse practitioners, allowed IPS to increase its charges to Allstate.

69

427.    All billing submitted by IPS to Allstate for services rendered by nurse practitioners who were not registered and/or properly supervised when the services were purportedly rendered is fraudulent.

428.    All of the fraudulent documentation regarding improper supervision of nurse practitioners was sent through the U.S. Mail, and Allstate relied upon the same in adjusting the claims.

429.    Allstate was not (or is not) required to pay IPS for the unlawful and fraudulent consultations billed for by IPS in connection with improper supervision of nurse practitioners.

430.    Such conduct is improper and unlawful, and any billing submitted to Allstate based on the improper and unlawful supervision of nurse practitioners was fraudulent.

b.    ***Fraudulent Representations That Nurse Practitioners Are Medical Doctors***

431.    Had An and Casimir properly supervised the nurse practitioners as required by law, the records and invoices IPS submitted to Allstate would show that the examinations purportedly administered were done by nurse practitioners rather than medical doctors.

432.    Pursuant to Tex. Occ. Code § 104.003(a), "[a] person subject to this section who uses the person's name on a written or printed professional identification, including a sign, pamphlet, stationery, or letterhead, or who uses the person's signature as a professional identification shall designate as required by this section the healing art the person is licensed to practice."

433.    "A person who is licensed by the Texas State Board of Medical Examiners and holds a doctor of medicine degree shall use:

(1) physician or surgeon, M.D.;
(2) doctor, M.D.; or
(3) doctor of medicine, M.D."

Tex. Occ. Code § 104.003(b).

434.  The representative examples set forth below show that IPS misrepresented that the consultations performed by nurse practitioners were instead performed by "medical doctors."

**Claimants: D.N. and T.D.**
**Claim No. 0719164279**
**DOL: 6/26/23**

435.  D.N. and T.D. were purportedly involved in a motor vehicle accident on June 26, 2023. As a result, D.N. and T.D. reported neck and lower back pain. Within 24 hours of the accident, based on the evidence set forth in this complaint, Patel and/or Sharma referred D.N. and T.D. for treatment at 290 Pain.

436.  On the following day (June 27, 2023), D.N. and T.D. consulted with Huynh. After a cursory examination, Huynh directed D.N. and T.D. to commence the predetermined treatment protocol, which included multiple visits to 290 Pain, visits to IPS and MRI testing at Breeze MRI.

437.  That same day, D.N. and T.D. purportedly consulted with nurse practitioner, Nicole Mirra. Based on the records and invoices submitted by IPS, Mirra, FNP-C and/or IPS unlawfully represented that Mirra, FNP-C was a medical doctor.

438.  A true and accurate depiction of IPS's medical record and invoice pertaining to the services purportedly administered to D.N. are set forth below (T.D.'s record and invoice are identical):



*        *        *



439.     IPS submitted claims for payments and accompanying medical records relative to D.N. and T.D. through the U.S. Mail for the unlawful and fraudulent consultations purportedly performed at an unknown branch of IPS, and Allstate relied upon the same in adjusting the claims.

440.     All of the fraudulent documentation that was allegedly provided to D.N. and T.D. was sent through the U.S. Mail and Allstate relied upon the same in adjusting the claims.

441.     Allstate was not (or is not) required to pay IPS for the unlawful and fraudulent consultations billed for by IPS in connection with D.N. and T.D.

442.     Such conduct is improper and unlawful and any billing submitted to Allstate based on these false representations concerning the medical license of nurse practitioners was fraudulent.

**Claimant: V.E.**
**Claim No. 0715153169**
**DOL: 5/23/23**

443.     V.E. was purportedly involved in a motor vehicle accident on May 23, 2023. As a result of the accident, V.E. purportedly sustained bilateral wrist, arm, neck and back pain. Within a week of the accident, based on the evidence set forth in this complaint, Patel and/or Sharma referred V.E. for treatment at 290 Pain.

444.     On June 1, 2023, V.E. purportedly consulted with Huynh. After a cursory examination, Huynh directed V.E. to start the predetermined treatment protocol, which included multiple visits to 290 Pain, visits to IPS and MRI testing performed at Breeze MRI.

445.     On June 30, 2023 V.E. presented to IPS, where he purportedly consulted with nurse practitioner, Yaima Martinez Gonzalez.

446.     Based on the records and invoices submitted by IPS, Gonzalez, FNP-C and/or IPS unlawfully represented that Gonzalez, FNP-C was a medical doctor.

447.    A true and accurate depiction of IPS's medical record and invoice pertaining to the

services rendered to V.E. are below:



\*        \*        \*



448.    IPS submitted claims for payments and accompanying medical records relative to V.E. through the U.S. Mail for the unlawful and fraudulent consultations purportedly performed at an unknown branch of IPS, and Allstate relied upon the same in adjusting the claims.

449.    Allstate was not (or is not) required to pay IPS for the unlawful and fraudulent consultations billed for by IPS in connection with V.E.

450.    At best, these misrepresentations about licensure demonstrate that An and Casimir were not supervising the nurse practitioners.  Had they been reviewing their files, they would have noticed the misrepresentation. At worst, it demonstrates that An and Casimir, through IPS, intentionally misrepresented to Allstate and Allstate claimants that the billed for consultations were performed by medical doctors .

451.    All of the fraudulent documentation that was allegedly provided to V.E. was sent through the U.S. Mail and Allstate relied upon the same in adjusting the claims.

452.    All billing submitted by IPS to Allstate for services rendered by nurse practitioners wherein they are falsely described to be medical doctors is fraudulent.

453.    Such conduct is improper and unlawful and any billing submitted to Allstate based on these referral arrangements was fraudulent.

### 2.    Fraudulent Billing for Consultations

454.    Providers like the Defendants have a responsibility to select and submit the billing code that truthfully identifies the services performed and the complexity involved in rendering those services.

455.    Physician examinations  of patients are billed using CPT codes that reflect the complexity involved in the examination and it is the responsibility of the provider to select the appropriate CPT code for the complexity involved in the examination.

456.    As discussed above, the Defendants made misrepresentations to Allstate by submitting documentation that included CPT codes for medical services (1) were not actually performed as represented, (2) were not performed consistent with established standards of care, and/or (3) were wholly unwarranted and unnecessary.

457.    The billed codes submitted to Allstate by the Defendants also consistently exaggerated the complexity of evaluations purportedly provided.

458.    There are multiple levels at which an office visit/examination or office consultation can be billed, with level one being the least involved examination and level five being the most complex.

459.    Initial office visits/examinations are billed using a CPT code that starts with the numbers "9920;" re-examinations are billed using a CPT code that starts with the numbers "9921;" and consultations are billed using a CPT code that starts with the numbers "9924."

460.    The final number to complete each five-digit CPT code for examinations and consultations is one (1) through five (5), depending on the complexity of the evaluation performed.

461.    To properly bill using level 4 complexity codes, the physician must have taken a comprehensive (initial encounter) or detailed (re-evaluation) history, performed a comprehensive (initial encounter) or detailed (re-evaluation) examination, and engaged in medical decision-making of moderate complexity.

462.    The AMA has guided that Level 4 examinations typically involve 45 minutes of face-to-face time.

463.    IPS has almost always submitted charged bills to Allstate claiming that it performed level 4 examinations (i.e., CPT codes 99204 and 99214). *See* Exhibit 6.

464.    All bills submitted using CPT codes 99204 and 99214 as a matter of course rather than based on an independent assessment of the complexity of medial decision-making were fraudulent.

465.    IPS has billed Allstate for at least 54 patient examinations.

466.    59 Pain has billed Allstate for at least 101 patient examinations.

467.    290 Pain has billed Allstate for at least 178 patient examinations.

468.    To warrant a medical bill demanding payment for a level four examination, the injury/condition necessarily requires:

- <u>moderate</u> risk of mortality, morbidity, and/or complications;
- <u>moderate</u> diagnoses and review of complex data; and
- the Defendants to (1) obtain <u>comprehensive</u> patient histories; (2) conduct <u>comprehensive</u> examinations; and (3) evaluate the patient (face-to-face) in an interaction lasting approximately 45 minutes.

469.    The examinations performed at IPS, 59 Pain and 290 Pain  fall woefully short of meeting the threshold standard to bill for office visits.

470.    For the patient appointments resulting in pre-printed and formulaic office records based off the predetermined treatment protocol described above, IPS , 59 Pain, and 290 Pain uniformly improperly upcoded bills to represent alleged complex medical evaluations.

471.    IPS's records do not support evaluations as extensive or complex as those represented by the charges submitted.

472.    IPS almost never documented a detailed patient history.

473.    While IPS, 59 Pain, and 290 Pain uniformly billed for purported "comprehensive" examinations, IPS's evaluations in actuality fabricated patient injuries and mischaracterized the severity of alleged motor vehicle accidents in an attempt to create the appearance of more significant injures and falsely justify their predetermined course of excessive treatment.

474.    IPS routinely charged $750.00 for initial evaluations performed by nurse practitioners under CPT code 99204, without demonstrating that the evaluation took at least 45 minutes.

475.    IPS routinely charged $550.00 for initial reevaluations performed by nurse practitioners under CPT code 99214, which indicates that the patient was an established patient, and that the reevaluation lasted at least 30 minutes.

476.    Indeed, An and Casimir, and the nurse practitioners hired by Sharma, did not document the time they spent face-to-face in any initial evaluations or reevaluations in their records.

477.    Sharma and/or the Sharma businesses then created invoices, which represented on their face that they were invoices created by IPS.

478.    In creating the invoices,  Sharma and/or the Sharma businesses selected the CPT codes to be used, and the price to charge for the services rendered to the patients that Sharma and/or Patel businesses referred to IPS.

479.    An and Casimir did not tell the referred patients about the referral agreements between the Defendants.

480.    An and Casimir did not inform the referred patients how much the Defendant Sharma and/or the Sharma businesses would charge for the services purportedly rendered at IPS.

481.    Sharma unilaterally selected a code that reflected that a more complex evaluation or reevaluation took place to substantiate the predetermined treatment protocol that was being prescribed, and to allow him to bill Allstate claimants through IPS at a higher rate.

482.    The charges selected by Sharma and/or the Sharma business were unreasonable, and selected to increase profits regardless of whether the billed for services were rendered as represented.

483.    A true and accurate excerpt from An's sworn statement concerning Sharma's dominion over the IPS invoices is depicted below:

```
13    Q.  Who would create invoices for Innovo?
14    A.  Invoices for Innovo?
15    Q.  Yes.
16    A.  I am assuming Deepak.
17    Q.  Did you ever review any invoices before
18  they went out?
19    A.  No.
```

484.    By creating medical bills that included CPT codes for office visits and then causing such bills to be mailed to Allstate, the Defendants represented to Allstate that the invoiced medical services had been performed in conformity with the AMA's CPT Code Guidelines.

485.    However, all of the bills prepared and mailed by the Defendants were submitted using fraudulent and deceptive examination CPT codes.

486.    As such, Allstate is not obligated to pay any pending bills for office visits and is entitled to reimbursement for those office visits for which it has already tendered payment.

487.    The Defendants never communicated to Allstate that they intended that the CPT codes they used to submit bills have any meanings other than those ascribed by the AMA.

488.    Allstate reasonably relied on the representations and published definitions assigned to the CPT and HCPCS codes billed by the Defendants.

489.    Allstate reasonably relied on the Defendants' utilization of CPT codes to accurately report the services they rendered to Allstate insureds.

490.    "Upcoding" of CPT codes represents an example of a fraudulent billing.

491.    "Upcoding" occurs when a healthcare provider submits codes to private insurers for more serious (and more expensive) examinations, treatment or procedures than the provider actually diagnosed or performed.

492.    Allstate is not required to pay the Defendants for upcoding services and is entitled to recover any payments tendered to the Defendants as a result of upcoding services.

493.    IPS improperly upcoded when it billed Allstate for initial patient evaluations, and reevaluations.

494. Allstate is not obligated to pay any pending bills for improperly coded office visits and is entitled to restitution for those office visits for which it has already adjusted the claim due to the misrepresentations.

495. The Defendants upcoded and fraudulently billed for consultations that were not administered as represented, unreasonable, medically unnecessary, and in violation of Texas law.

496. All of the fraudulent documentation for consultations was sent through the U.S. Mail, and Allstate relied upon the same in adjusting the claims.

497. Allstate was not (or is not) required to pay IPS, 59 Pain, and 290 Pain for the unlawful and fraudulent consultations billed for by IPS, 59 Pain, and 290 Pain.

498. Such conduct is improper and unlawful, and any billing submitted to Allstate based on these upcoded services was fraudulent.

### 3. Fraudulent Billing for Fluoroscopy

499. "Unbundling" of CPT codes represents an example of a fraudulent and abusive billing tactic.

500. Unbundling occurs when multiple CPT codes are billed for the component parts of a procedure when there is a single code available that includes the complete procedure.

501. Allstate is not required to pay the Defendants for unbundled services and is entitled to recover any payments tendered to the Defendants as a result of unbundling services.

502. With respect to most of the injections administered to patients at issue in this Complaint, IPS wrongfully unbundled the charges associated with the procedures to increase patient billings.

503. IPS routinely charged $500.00 for fluoroscopic guidance under CPT code 72275 in connection with the injections.

504.   CPT code 72275 is only to be used when an epidurogram is performed, images documented, and a formal radiologic report is issued.  IPS does not perform epidurograms during ESIs, nor was a formal radiologic report issued.

505.   Instead, IPS use of fluoroscopic guidance is essential to performing ESIs, and therefore, must not be reported separately from such procedures.

506.   Pursuant to the AMA, CPT code 62323 specifically provides that it is being utilized to report that such injections were performed with imaging guidance (i.e., fluoroscopy or CT).

507.   According to the AMA, "codes designated as "separate procedures" should not be reported in addition to the code for the total procedure or service of which it is considered an integral component."

508.   Even if the injections were clinically necessary, properly charged, and compensable, the charges for these services were deliberately unbundled as a means to increase the value of IPS's services.

509.   When injections are billed using this CPT code and fluoroscopic guidance is provided as part of the injection procedure, then the fluoroscopic guidance cannot be charged separately.

510.   However, as illustrated through the representative examples contained in the chart affixed as Exhibit 7, IPS billed separately for fluoroscopic guidance in connection with procedures that specifically include fluoroscopic guidance in a deliberate attempt to generate fraudulent charges.

511.   The charges for fluoroscopic guidance submitted to Allstate are fraudulent.

512. The Defendants unbundled and fraudulently billed for fluoroscopy CPT codes that were not administered as represented, unreasonable, medically unnecessary, and in violation of Texas law.

513. All of the fraudulent documentation for consultations was sent through the U.S. Mail, and Allstate relied upon the same in adjusting the claims.

514. Allstate was not (or is not) required to pay IPS for the unbundled and fraudulent fluoroscopy CPT codes billed for by IPS.

515. Such conduct is improper and unlawful, and any billing submitted to Allstate based on these unbundled services was fraudulent.

### 4. Billing for X-rays That Were Not Rendered As Represented

516. Billing for services that were not rendered as represented is another example of fraudulent billing.

517. Billing for services that were not rendered as represented occurs when a healthcare provider bills using a CPT code, however, the provider misrepresented that it completed all of the tasks described by the AMA that need to be completed under the chosen CPT code.

518. Allstate is not required to pay the Defendants for services that were not provided to patients as represented and is entitled to recover any payments tendered to the Defendants as a result of their fraudulent billing for services not rendered as represented.

519. With respect to X-rays purportedly taken of patients at issue in this Complaint, 59 Pain wrongfully billed as if it had taken the X-rays at 59 Pain (the Southwest location) of Allstate claimants, when the X-rays that were reportedly taken were also reported as being taken at and by Breeze MRI.

520.     59 Pain routinely charged over $1,000.00 for X-rays under various CPT codes appropriate to specific areas and the amount of views captured when there were no concerns reflected in the records as to any red flags that could potentially justify the imaging.

521.     The representative examples set forth below demonstrate how 59 Pain billed for X-rays it did not take to increase  bills.

**Claimant: L.T. and T.N.**
**Claim No. 0636859456**
**DOL: 8/1/21**

522.     L.T. and T.N. were purportedly involved in a motor vehicle accident of August 1, 2021. They reported injuries to their necks and backs. On August 2, 2021, L.T. and T.N consulted with Le of 59 Pain.

523.     On August 14, 2021, pursuant to Breeze MRI records, someone at Breeze MRI took the X-rays of both L.T. and T.N.'s cervical, thoracic, and lumbosacral back, and bilateral shoulders.

524.     There is no indication in L.T. or T.N.'s records from 59 Pain that anyone, including Le ordered the X-rays, received the X-rays, reviewed the X-rays, and/or discussed any findings from the X-rays with L.T. and T.N.

525.     In addition to the fact that Le did not order the X-rays, based on evidence obtained during Allstate's investigation, Breeze MRI took the X-rays at the direction of Patel, and misrepresented that Le was the referring physician.

526.     A true and accurate excerpt from the Breeze MRI record is depicted below:



527.    Even though the X-rays were neither ordered, nor taken by Le at 59 Pain, 59 Pain submitted identical bills to L.T. and T.N. for $1,800.00 and $1,500.00, respectively.

528.    A true and accurate excerpt from 59 Pain's invoice for T.N. is depicted below:

| 8/14/2021 | 72050 | X-rays of Cervical Series (4+) | 1 | 500.00 |
| 8/14/2021 | 71046 | Chest 2V | 1 | 400.00 |
| 8/14/2021 | 72100 | Lumbosacral X-RAYS ( AP/LAT) | 1 | 300.00 |
| 8/14/2021 | 73030 | X-ray of Shoulder | 2 | 600.00 |

529.    The Defendants fraudulently billed L.T. and T.N. for X-rays that were not administered as represented, unreasonable, medically unnecessary, and in violation of Texas law.

530.    All of the fraudulent documentation for X-rays that was allegedly provided to L.T. and T.N. was sent through the U.S. Mail, and Allstate relied upon the same in adjusting the claims.

531.    Allstate was not (or is not) required to pay 59 Pain for the unlawful and fraudulent X-rays billed for by 59 Pain in connection with L.T. and T.N.

532.    The treatment allegedly provided to L.T. and T.N. was improper and unlawful, and any billing submitted to Allstate based on fraudulent billing for X-rays not performed.

Claimant: L.L.
Claim No. 0644995739
DOL: 10/5/21

533.     L.L. was purportedly involved in a motor vehicle accident of October 5, 2021. She reported injuries to her neck and back.

534.     On October 7, 2021, she consulted with Le of 59 Pain.

535.     On October 14, 2021, pursuant to Breeze MRI records, someone at Breeze MRI took the X-rays of L.L.'s cervical, thoracic, and lumbosacral back.  There was no indication in L.L.'s records from 59 Pain that X-rays were necessary.

536.     There was also no indication that anyone, including Le ordered the X-rays, received the X-rays, reviewed the X-rays, and/or discussed any findings from the X-rays with L.L.

537.     Despite the fact that Le did not order the X-rays, based on evidence obtained during Allstate's investigation, Breeze MRI took the X-rays at the direction of Patel, and misrepresented that Le was the referring physician.

538.     A true and accurate excerpt from the Breeze MRI record is depicted below:



539.     Even though the X-rays were neither ordered, nor taken by Defendant Le at 59 Pain, 59 Pain submitted a bill to L.L. for $1,200.00.  A true and accurate excerpt from 59 Pain's invoice is depicted below:

| 10/14/2021 | 72050 | X-rays of Cervical Series (4+) | 1 | 500.00 |
| 10/14/2021 | 72070 | Thoracic X-RAYS ( AP/LAT) | 1 | 300.00 |
| 10/14/2021 | 72100 | Lumbosacral X-RAYS ( AP/LAT) | 1 | 300.00 |

540.    The Defendants fraudulently billed L.L. for X-rays that were not administered as represented, unreasonable, medically unnecessary, and in violation of Texas law.

541.    All of the fraudulent documentation for X-rays that were allegedly provided to L.L. were sent through the U.S. Mail, and Allstate relied upon the same in adjusting the claims.

542.    Allstate was not (or is not) required to pay 59 Pain for the unlawful and fraudulent X-rays billed for by 59 Pain in connection with L.L.

543.    The treatment allegedly provided to L.L. was improper and unlawful, and any billing for X-rays not performed is fraudulent.

## V.    SPECIFIC ALLEGATIONS OF MAIL FRAUD RACKETEERING ACTIVITY

544.    Throughout the course of this scheme, the Defendants created, prepared, and submitted (or caused to be created, prepared, and submitted) false medical documentation and intentionally violated the laws of the United States by devising, and intending to devise, schemes to defraud and obtain money and property by means of false and fraudulent pretenses in representations, and by placing (or causing to be placed) in a post office and/or authorized depository for mail matter, things to be sent and delivered by the United States Postal Services, in violation of 18 U.S.C. § 1341 (mail fraud) for the purpose of executing, or attempting, such fraudulent schemes.

545.    The Defendants prepared fraudulent bills, and supporting medical documentation to send to personal injury attorneys, who in turn, included the fraudulent bills and records in

demand packages submitted through the U.S. Mail to Allstate (as the insurers of the allegedly at fault driver in the underlying automobile accident).

546.    The Defendants knew that personal injury attorneys would then use the bills and records to extract payments from Allstate.

547.    The Defendants knew Allstate would make payments on the claims based on the fraudulent bills and records, and Allstate used the US Mail to send the payments.

548.    Unless otherwise pled to the contrary, all documents, invoices, narrative reports, letters, and requests for payments in connection with the insurance claims referenced throughout the balance of this Complaint traveled through the U.S. Mail.

549.    Every automobile insurance claim detailed herein involved at least two uses of the U.S. Mail, including the mailing of invoices, narrative reports, and payments, and caused various other mailings in the ordinary course of the claims process.

## A.    59 PAIN

550.    Patel, Sharma, Huynh, Le, CXR, HRX, Innovo Management, IPS, An, and/or Casimir, took part in the creation, operation, and control of 59 Pain for the purpose of generating fraudulent reports and invoices.

551.    These Defendants all attempted to capitalize on an unlawful application of various state and federal laws and regulations to enrich themselves through the submission of fraudulent bills to Allstate for unnecessary and unlawful services. 59 Pain, through the operation and control by Patel, Sharma, Huynh, Le, CXR, HRX, Innovo Management, IPS, An, and/or Casimir, was the means by which the Defendants caused 59 Pain's fraudulent invoices to be submitted to Allstate claimants and Allstate through the U.S. Mail.

552.    Patel, Sharma, Huynh, Le, CXR, HRX, Innovo Management, IPS, An, and/or Casimir, personally used the U.S. Mail (or caused the U.S. Mail to be used) to further this fraudulent scheme by causing invoices and records from 59 Pain to be mailed to Allstate and/or counsel for insureds, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

553.    Patel, Sharma, Huynh, Le, CXR, HRX, Innovo Management, IPS, An, and/or Casimir, caused 59 Pain to falsely certify that it was, in all respects, eligible to be reimbursed under applicable state and federal law each time that 59 Pain mailed a demand for payment (i.e., invoice) to Allstate.

554.    Persons acting under Patel, Sharma, Huynh, Le, CXR, HRX, Innovo Management, IPS, An, and/or Casimir's direction and control provided unnecessary medical services to Allstate insureds, when no such services were ordered by a medical professional, and generated fraudulent invoices as a result, which rendered 59 Pain completely ineligible for reimbursement under state and federal law.

555.    Because 59 Pain was not lawfully eligible to seek or collect benefit payments under state and federal law, Patel, Sharma, Huynh, Le, CXR, HRX, Innovo Management, IPS, An, and/or Casimir, purposely caused 59 Pain to make a misrepresentation each and every time that 59 Pain mailed a document to Allstate claiming eligibility for reimbursement.

556.    Patel, Sharma, Huynh, Le, CXR, HRX, Innovo Management, IPS, An, and/or Casimir, committed mail fraud through the 59 Pain enterprise because: (a) 59 Pain was not lawfully eligible to seek or collect benefit payments; (b) 59 Pain was caused to seek reimbursement from Allstate even though 59 Pain was not entitled to such reimbursement; and (c) 59 Pain used (or was caused to use) the U.S. Mail to seek reimbursement.

557.    At all relevant times, Patel, Sharma, Huynh, Le, CXR, HRX, Innovo Management, IPS, An, and/or Casimir, knew that 59 Pain (including its employees, owner(s), contractors, and agents), an insured, an insurance carrier, insured's attorney, and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by 59 Pain.

558.    Allstate estimates that the unlawful operation of the 59 Pain enterprise generated hundreds of mailings throughout the relevant time period.

559.    A table highlighting the relevant examples of mailings made in furtherance of this scheme is annexed hereto at Exhibit 8 and incorporated by reference as if set forth in its entirety.

**B.    290 PAIN**

560.    Breeze MRI, CXR, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma, took part in the creation, operation, and control of 290 Pain for the purpose of generating fraudulent reports and invoices.

561.    These Defendants all attempted to capitalize on an unlawful application of various state and federal laws and regulations to enrich themselves through the submission of fraudulent bills to Allstate for unnecessary and unlawful services. 290 Pain, through the operation and control by Breeze MRI, CXR, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma, was the means by which the Defendants caused 290 Pain fraudulent invoices to be submitted to Allstate claimants and Allstate through the U.S. Mail.

562.    Breeze MRI, CXR, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma, personally used the U.S. Mail (or caused the U.S. Mail to be used) to further this fraudulent scheme by causing invoices and records from 290 Pain to be mailed to Allstate and/or

counsel for insureds, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

563.    Breeze MRI, CXR, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma, caused 290 Pain to falsely certify that it was, in all respects, eligible to be reimbursed under applicable state and federal law each time that 290 Pain mailed a demand for payment (i.e., invoice) to Allstate.

564.    Persons acting under Breeze MRI, CXR, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma's direction and control provided unnecessary medical services to Allstate insureds, when no such services were ordered by a medical professional, and generated fraudulent invoices as a result, which rendered 290 Pain completely ineligible for reimbursement under state and federal law.

565.    Because 290 Pain was not lawfully eligible to seek or collect benefit payments under state and federal law, Breeze MRI, CXR, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma, purposely caused 290 Pain to make a misrepresentation each and every time that 290 Pain mailed a document to Allstate claiming eligibility for reimbursement.

566.    Breeze MRI, CXR, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma committed mail fraud through the 290 Pain enterprise because: (a) 290 Pain was not lawfully eligible to seek or collect benefit payments; (b) 290 Pain was caused to seek reimbursement from Allstate even though 290 Pain was not entitled to such reimbursement; and (c) 290 Pain used (or was caused to use) the U.S. Mail to seek reimbursement.

567.    At all relevant times, Breeze MRI, CXR, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma, knew that 290 Pain (including its employees, owner(s), contractors, and agents), an insured, an insurance carrier, insured's attorney, and/or Allstate would

use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by 290 Pain.

568. Allstate estimates that the unlawful operation of the 290 Pain enterprise generated hundreds of mailings throughout the relevant time period.

569. A table highlighting the relevant examples of mailings made in furtherance of this scheme is annexed hereto at Exhibit 9 and incorporated by reference as if set forth in its entirety.

## C.    <u>BREEZE MRI</u>

570. 59 Pain, 290 Pain, CXR, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma, took part in the creation, operation, and control of Breeze MRI for the purpose of generating fraudulent reports and invoices.

571. These Defendants all attempted to capitalize on an unlawful application of various state and federal laws and regulations to enrich themselves through the submission of fraudulent bills to Allstate for unnecessary and unlawful services. Breeze MRI, through the operation and control by 59 Pain, 290 Pain, CXR, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma, was the means by which the Defendants caused Breeze MRI fraudulent invoices to be submitted to Allstate claimants and Allstate through the U.S. Mail.

572. 59 Pain, 290 Pain, CXR, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma, personally used the U.S. Mail (or caused the U.S. Mail to be used) to further this fraudulent scheme by causing invoices and records from Breeze MRI to be mailed to Allstate and/or counsel for insureds, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

573. 59 Pain, 290 Pain, CXR, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma, caused Breeze MRI to falsely certify that it was, in all respects, eligible to be

reimbursed under applicable state and federal law each time that Breeze MRI mailed a demand for payment (i.e., invoice) to Allstate.

574.    Persons acting under 59 Pain, 290 Pain, CXR, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma's direction and control provided unnecessary medical services and diagnostic testing to Allstate insureds, when no such services were ordered by a medical professional, and generated fraudulent invoices as a result, which rendered Breeze MRI completely ineligible for reimbursement under state and federal law.

575.    Because Breeze MRI was not lawfully eligible to seek or collect benefit payments under state and federal law, 59 Pain, 290 Pain, CXR, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma, purposely caused Breeze MRI to make a misrepresentation each and every time that Breeze MRI mailed a document to Allstate claiming eligibility for reimbursement.

576.    59 Pain, 290 Pain, CXR, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma committed mail fraud through the Breeze MRI enterprise because: (a) Breeze MRI was not lawfully eligible to seek or collect benefit payments; (b) Breeze MRI was caused to seek reimbursement from Allstate even though Breeze MRI was not entitled to such reimbursement; and (c) Breeze used (or was caused to use) the U.S. Mail to seek reimbursement.

577.    At all relevant times, 59 Pain, 290 Pain, CXR, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma, knew that Breeze MRI (including its employees, owner(s), contractors, and agents), an insured, an insurance carrier, insured's attorney, and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Breeze MRI.

578.    Allstate estimates that the unlawful operation of the Breeze MRI enterprise generated hundreds of mailings throughout the relevant time period.

579.    A table highlighting the relevant examples of mailings made in furtherance of this scheme is annexed hereto at Exhibit 10 and incorporated by reference as if set forth in its entirety.

**D.    IPS**

580.    59 Pain, 290 Pain, Breeze MRI, CXR, HRX, Innovo Management, An, Casimir, Huynh, Le, Patel and Sharma took part in the creation, operation, and control of IPS for the purpose of generating fraudulent reports and invoices.

581.    These Defendants all attempted to capitalize on an unlawful application of various state and federal laws and regulations to enrich themselves through the submission of fraudulent bills to Allstate for unnecessary and unlawful services. IPS, through the operation and control by 59 Pain, 290 Pain, Breeze MRI, CXR, HRX, Innovo Management, An, Casimir, Huynh, Le, Patel and Sharma, was the means by which the Defendants caused IPS fraudulent invoices to be submitted to Allstate claimants and Allstate through the U.S. Mail.

582.    59 Pain, 290 Pain, Breeze MRI, CXR, HRX, Innovo Management, An, Casimir, Huynh, Le, Patel and Sharma, personally used the U.S. Mail (or caused the U.S. Mail to be used) to further this fraudulent scheme by causing invoices and records from IPS to be mailed to Allstate and/or counsel for insureds, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

583.    59 Pain, 290 Pain, Breeze MRI, CXR, HRX, Innovo Management, An, Casimir, Huynh, Le, Patel and Sharma, caused IPS to falsely certify that it was, in all respects, eligible to be reimbursed under applicable state and federal law each time that IPS mailed a demand for payment (i.e., invoice) to Allstate.

584.    Persons acting under 59 Pain, 290 Pain, Breeze MRI, CXR, HRX, Innovo Management, An, Casimir, Huynh, Le, Patel and Sharma's direction and control provided unnecessary medical services and diagnostic testing to Allstate insureds, when no such services were ordered by a medical professional, and generated fraudulent invoices as a result, which rendered IPS completely ineligible for reimbursement under state and federal law.

585.    Because IPS was not lawfully eligible to seek or collect benefit payments under state and federal law, 59 Pain, 290 Pain, Breeze MRI, CXR, HRX, Innovo Management, An, Casimir, Huynh, Le, Patel and Sharma, purposely caused IPS to make a misrepresentation each and every time that IPS mailed a document to Allstate claiming eligibility for reimbursement.

586.    59 Pain, 290 Pain, Breeze MRI, CXR, HRX, Innovo Management, An, Casimir, Huynh, Le, Patel and Sharma committed mail fraud through the IPS enterprise because: (a) IPS was not lawfully eligible to seek or collect benefit payments; (b) IPS was caused to seek reimbursement from Allstate even though IPS was not entitled to such reimbursement; and (c) IPS used (or was caused to use) the U.S. Mail to seek reimbursement.

587.    At all relevant times, 59 Pain, 290 Pain, Breeze MRI, CXR, HRX, Innovo Management, An, Casimir, Huynh, Le, Patel and Sharma, knew that IPS (including its employees, owner(s), contractors, and agents), an insured, an insurance carrier, insured's attorney, and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by IPS.

588.    Allstate estimates that the unlawful operation of the IPS enterprise generated hundreds of mailings throughout the relevant time period.

589.    A table highlighting the relevant examples of mailings made in furtherance of this scheme is annexed hereto at Exhibit 11 and incorporated by reference as if set forth in its entirety.

E.    **CXR**

590.    59 Pain, 290 Pain, Breeze MRI, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma took part in the creation, operation, and/or control of CXR for the purpose of generating fraudulent reports and invoices.

591.    These Defendants all attempted to capitalize on an unlawful application of various state and federal laws and regulations to enrich themselves through the submission of fraudulent bills to Allstate for unnecessary and unlawful services. CXR, through the operation and control by 59 Pain, 290 Pain, Breeze MRI, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma, was the means by which the Defendants caused CXR fraudulent invoices to be submitted to Allstate claimants and Allstate through the U.S. Mail.

592.    59 Pain, 290 Pain, Breeze MRI, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma, personally used the U.S. Mail (or caused the U.S. Mail to be used) to further this fraudulent scheme by causing invoices and records from 59 Pain, 290 Pain, Breeze MRI, and/or IPS to be mailed to Allstate and/or counsel for insureds, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

593.    59 Pain, 290 Pain, Breeze MRI, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma, caused 59 Pain, 290 Pain, Breeze MRI, and/or IPS to falsely certify they were, in all respects, eligible to be reimbursed under applicable state and federal law each time that 59 Pain, 290 Pain, Breeze MRI, and/or IPS mailed a demand for payment (i.e., invoice) to Allstate.

594.    Persons acting under 59 Pain, 290 Pain, Breeze MRI, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma's direction and control provided unnecessary medical services and diagnostic testing to Allstate insureds, when no such services were ordered

by a medical professional, and generated fraudulent invoices as a result, which rendered 59 Pain, 290 Pain, Breeze MRI, and/or IPS completely ineligible for reimbursement under state and federal law.

595.    Because 59 Pain, 290 Pain, Breeze MRI, and/or IPS were not lawfully eligible to seek or collect benefit payments under state and federal law, 59 Pain, 290 Pain, Breeze MRI, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma, purposely caused CXR to make a misrepresentation each and every time that IPS, 290 Pain, 59 Pain, and/or Breeze MRI mailed a document to Allstate claiming eligibility for reimbursement.

596.    59 Pain, 290 Pain, Breeze MRI, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma committed mail fraud through the CXR enterprise because: (a) IPS, 290 Pain, 59 Pain, and Breeze MRI were not lawfully eligible to seek or collect benefit payments; (b) 290 Pain, 59 Pain, and Breeze MRI were caused to seek reimbursement from Allstate even though CXR was not entitled to such reimbursement; and (c) 290 Pain, 59 Pain, and Breeze MRI used (or was caused to use) the U.S. Mail to seek reimbursement.

597.    At all relevant times, 59 Pain, 290 Pain, Breeze MRI, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma, knew that 290 Pain, 59 Pain, and Breeze MRI (including their employees, owner(s), contractors, and agents), an insured, an insurance carrier, insured's attorney, and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by 59 Pain, 290 Pain, Breeze MRI, and/or IPS.

598.    Allstate estimates that the unlawful operation of the CXR enterprise caused hundreds of mailings throughout the relevant time period.

599.    A table highlighting the relevant examples of mailings made in furtherance of this scheme is annexed hereto at Exhibits 8-11 and incorporated by reference as if set forth in its entirety.

**F.    HRX**

600.    59 Pain, 290 Pain, Breeze MRI, CXR, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma took part in the creation, operation, and/or control of HRX for the purpose of generating fraudulent reports and invoices.

601.    These Defendants all attempted to capitalize on an unlawful application of various state and federal laws and regulations to enrich themselves through the submission of fraudulent bills to Allstate for unnecessary and unlawful services. HRX, through the operation and control by 59 Pain, 290 Pain, Breeze MRI, CXR, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma, was the means by which the Defendants caused HRX fraudulent invoices to be submitted to Allstate claimants and Allstate through the U.S. Mail.

602.    59 Pain, 290 Pain, Breeze MRI, CXR, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma, personally used the U.S. Mail (or caused the U.S. Mail to be used) to further this fraudulent scheme by causing invoices and records from 59 Pain, 290 Pain, Breeze MRI, and/or IPS to be mailed to Allstate and/or counsel for insureds, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

603.    59 Pain, 290 Pain, Breeze MRI, CXR, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma, caused 59 Pain, 290 Pain, Breeze MRI, and/or IPS to falsely certify that they were, in all respects, eligible to be reimbursed under applicable state and federal law each time that 59 Pain, 290 Pain, Breeze MRI, and/or IPS mailed a demand for payment (i.e., invoice) to Allstate.

604.    Persons acting under 59 Pain, 290 Pain, Breeze MRI, CXR, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma's direction and control provided unnecessary medical services and diagnostic testing to Allstate insureds, when no such services were ordered by a medical professional, and generated fraudulent invoices as a result, which rendered 59 Pain, 290 Pain, Breeze MRI, and/or IPS completely ineligible for reimbursement under state and federal law.

605.    Because 59 Pain, 290 Pain, Breeze MRI, and/or IPS were not lawfully eligible to seek or collect benefit payments under state and federal law, 59 Pain, 290 Pain, Breeze MRI, CXR, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma, purposely caused HRX to make a misrepresentation each and every time that IPS, 290 Pain, 59 Pain, and/or Breeze MRI mailed a document to Allstate claiming eligibility for reimbursement.

606.    59 Pain, 290 Pain, Breeze MRI, CXR, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma committed mail fraud through the HRX enterprise because: (a) IPS, 290 Pain, 59 Pain, and Breeze MRI were not lawfully eligible to seek or collect benefit payments; (b) IPS, 290 Pain, 59 Pain, and Breeze MRI were caused to seek reimbursement from Allstate even though HRX was not entitled to such reimbursement; and (c) IPS, 290 Pain, 59 Pain, and Breeze MRI used (or was caused to use) the U.S. Mail to seek reimbursement.

607.    At all relevant times, 59 Pain, 290 Pain, Breeze MRI, CXR, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma, knew that IPS, 290 Pain, 59 Pain, and Breeze MRI (including their employees, owner(s), contractors, and agents), an insured, an insurance carrier, insured's attorney, and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by 59 Pain, 290 Pain, Breeze MRI, and/or IPS.

608. Allstate estimates that the unlawful operation of the HRX enterprise caused hundreds of mailings throughout the relevant time period.

609. A table highlighting the relevant examples of mailings made in furtherance of this scheme is annexed hereto at Exhibits 8-11 and incorporated by reference as if set forth in its entirety.

G. **INNOVO MANAGEMENT**

610. 59 Pain, 290 Pain, Breeze MRI, CXR, HRX, IPS, An, Casimir, Huynh, Le, Patel and Sharma took part in the creation, operation, and/or control of Innovo Management for the purpose of generating fraudulent reports and invoices.

611. These Defendants all attempted to capitalize on an unlawful application of various state and federal laws and regulations to enrich themselves through the submission of fraudulent bills to Allstate for unnecessary and unlawful services. Innovo Management, through the operation and control by 59 Pain, 290 Pain, Breeze MRI, CXR, HRX, IPS, An, Casimir, Huynh, Le, Patel and Sharma, was the means by which the Defendants caused Innovo Management fraudulent invoices to be submitted to Allstate claimants and Allstate through the U.S. Mail.

612. 59 Pain, 290 Pain, Breeze MRI, CXR, HRX, IPS, An, Casimir, Huynh, Le, Patel and Sharma, personally used the U.S. Mail (or caused the U.S. Mail to be used) to further this fraudulent scheme by causing invoices and records from 59 Pain, 290 Pain, Breeze MRI, and/or IPS to be mailed to Allstate and/or counsel for insureds, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

613. 59 Pain, 290 Pain, Breeze MRI, CXR, HRX, IPS, An, Casimir, Huynh, Le, Patel and Sharma, caused 59 Pain, 290 Pain, Breeze MRI, and/or IPS to falsely certify that they were,

in all respects, eligible to be reimbursed under applicable state and federal law each time that 59 Pain, 290 Pain, Breeze MRI, and/or IPS mailed a demand for payment (i.e., invoice) to Allstate.

614.    Persons acting under 59 Pain, 290 Pain, Breeze MRI, CXR, HRX, IPS, An, Casimir, Huynh, Le, Patel and Sharma's direction and control provided unnecessary medical services and diagnostic testing to Allstate insureds, when no such services were ordered by a medical professional, and generated fraudulent invoices as a result, which rendered 59 Pain, 290 Pain, Breeze MRI, and/or IPS completely ineligible for reimbursement under state and federal law.

615.    Because 59 Pain, 290 Pain, Breeze MRI, and/or IPS were not lawfully eligible to seek or collect benefit payments under state and federal law, 59 Pain, 290 Pain, Breeze MRI, CXR, HRX, IPS, An, Casimir, Huynh, Le, Patel and Sharma, purposely caused IPS to make a misrepresentation each and every time that IPS, 290 Pain, 59 Pain, and/or Breeze MRI mailed a document to Allstate claiming eligibility for reimbursement.

616.    59 Pain, 290 Pain, Breeze MRI, CXR, HRX, IPS, An, Casimir, Huynh, Le, Patel and Sharma committed mail fraud through the Innovo Management enterprise because: (a) IPS, 290 Pain, 59 Pain, and Breeze MRI were not lawfully eligible to seek or collect benefit payments; (b) IPS, 290 Pain, 59 Pain, and Breeze MRI were caused to seek reimbursement from Allstate even though Innovo Management was not entitled to such reimbursement; and (c) IPS, 290 Pain, 59 Pain, and Breeze MRI used (or was caused to use) the U.S. Mail to seek reimbursement.

617.    At all relevant times, 59 Pain, 290 Pain, Breeze MRI, CXR, HRX, IPS, An, Casimir, Huynh, Le, Patel and Sharma, knew that IPS, 290 Pain, 59 Pain, and Breeze MRI (including its employees, owner(s), contractors, and agents), an insured, an insurance carrier, insured's attorney, and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the

fraudulent claims, including issuing payments based upon documentation mailed by 59 Pain, 290 Pain, Breeze MRI, and/or IPS.

618.    Allstate estimates that the unlawful operation of the Innovo Management enterprise caused hundreds of mailings throughout the relevant time period.

619.    A table highlighting the relevant examples of mailings made in furtherance of this scheme is annexed hereto at Exhibits 8-11 and incorporated by reference as if set forth in its entirety.

## VI.    SPECIFIC ALLEGATIONS OF FRAUDULENT CONCEALMENT AND MATERIAL MISREPRESENTATIONS MADE TO AND RELIED UPON BY ALLSTATE

### A.    59 PAIN – FRAUDULENT CONCEALMENT

620.    At all relevant times during the operation of the 59 Pain enterprise, CXR, HRX, Breeze MRI, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma purposely caused 59 Pain to falsely certify that it was, in all respects, eligible to be reimbursed under applicable state and federal laws as a means to induce Allstate to promptly pay charges related to false, fraudulent, and unnecessary medical services purportedly provided to Allstate insureds.

621.    CXR, HRX, Breeze MRI, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma (along with those individuals working under their control) purposely concealed the lack of necessity for the medical services purportedly provided and charged for by 59 Pain.

622.    CXR, HRX, Breeze MRI, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma (or those working under their direction and control) created and submitted to Allstate (or caused the creation and submission of) records that falsely purported to justify the necessity of the medical services purportedly provided by 59 Pain to Allstate insureds.

623.    Because CXR, HRX, Breeze MRI, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma were responsible for: (a) directing the fraudulent services purportedly

rendered on behalf of Allstate insureds through 59 Pain; (b) creating, altering, and/or fabricating records submitted to Allstate in support of services purportedly rendered on behalf of Allstate insureds; (c) billing Allstate for the fraudulent medical services purportedly rendered on behalf of Allstate insureds through 59 Pain; (d) falsely charging for the services with the knowledge that these services were not lawfully reimbursable under applicable laws; and (e) billing Allstate for services that were, in most instances, never actually provided as represented, 59 Pain was caused to falsely claim eligibility each and every time that 59 Pain sought reimbursement from Allstate.

624.    As alleged above, CXR, HRX, Breeze MRI, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma (or those persons working under their control) caused 59 Pain to create and submit to Allstate claim reimbursement documents and demands for payment relative to services that were: (a) unlawful; (b) unnecessary; (c) fraudulent; and/or, (d) not actually provided as represented.

625.    Such conduct is unlawful, and rendered each such claim fraudulent under applicable state and federal laws.

626.    Many of the false, fraudulent, and unlawful acts, including, among other things, charging for services never actually provided, are not readily evident within the four corners of the documents submitted to Allstate by these Defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete claim at issue in this matter.

627.    Thus, every time that CXR, HRX, Breeze MRI, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma (along with those individuals working under their control) caused 59 Pain to submit reimbursement demands to Allstate, CXR, HRX, Breeze MRI, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma (and those individuals working

under their control) necessarily certified that 59 Pain was, in all respects, eligible to be reimbursed under applicable state and federal laws.

628.    The full extent of CXR, HRX, Breeze MRI, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma's fraudulent and unlawful acts relative to their participation in 59 Pain enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

## B.    290 PAIN – FRAUDULENT CONCEALMENT

629.    At all relevant times during the operation of the 290 Pain enterprise, CXR, HRX, Breeze MRI, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma purposely caused 290 Pain to falsely certify that it was, in all respects, eligible to be reimbursed under applicable state and federal laws as a means to induce Allstate to promptly pay charges related to false, fraudulent, and unnecessary medical services purportedly provided to Allstate insureds.

630.    CXR, HRX, Breeze MRI, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma (along with those individuals working under their control) purposely concealed the lack of necessity for the medical services purportedly provided and charged for by 290 Pain.

631.    CXR, HRX, Breeze MRI, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma (or those working under their direction and control) created and submitted to Allstate (or caused the creation and submission of) records that falsely purported to justify the necessity of the medical services purportedly provided by 290 Pain to Allstate insureds.

632.    Because CXR, HRX, Breeze MRI, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma were responsible for: (a) directing the fraudulent services purportedly rendered on behalf of Allstate insureds through 290 Pain; (b) creating, altering, and/or fabricating records submitted to Allstate in support of services purportedly rendered on behalf of Allstate

104

insureds; (c) billing Allstate for the fraudulent medical services purportedly rendered on behalf of Allstate insureds through 290 Pain; (d) falsely charging for the services with the knowledge that these services were not lawfully reimbursable under applicable laws; and (e) billing Allstate for services that were, in most instances, never actually rendered as represented, 290 Pain was caused to falsely claim eligibility each and every time that 290 Pain sought reimbursement from Allstate.

633.    As alleged above, CXR, HRX, Breeze MRI, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma (or those persons working under their control) caused 290 Pain to create and submit to Allstate claim reimbursement documents and demands for payment relative to services that were: (a) unlawful; (b) unnecessary; (c) fraudulent; and/or, (d) not actually provided as represented.

634.    Such conduct is unlawful, and rendered each such claim fraudulent under applicable state and federal laws.

635.    Many of the false, fraudulent, and unlawful acts, including, among other things, charging for services never actually provided, are not readily evident within the four corners of the documents submitted to Allstate by these Defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete claim at issue in this matter.

636.    Thus, every time that CXR, HRX, Breeze MRI, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma (along with those individuals working under their control) caused 290 Pain to submit reimbursement demands to Allstate, CXR, HRX, Breeze MRI, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma (and those individuals working under their control) necessarily certified that 290 Pain was, in all respects, eligible to be reimbursed under applicable state and federal laws.

637.    The full extent of CXR, HRX, Breeze MRI, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma's fraudulent and unlawful acts relative to their participation in the 290 Pain enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

C.    **BREEZE MRI – FRAUDULENT CONCEALMENT**

638.    At all relevant times during the operation of the Breeze MRI enterprise, 59 Pain, 290 Pain, CXR, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma, purposely caused Breeze MRI to falsely certify that it was, in all respects, eligible to be reimbursed under applicable state and federal laws as a means to induce Allstate to promptly pay charges related to false, fraudulent, and unnecessary medical services purportedly provided to Allstate insureds.

639.    59 Pain, 290 Pain, CXR, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma (along with those individuals working under their control) purposely concealed the lack of necessity for the medical services purportedly provided and charged for by Breeze MRI.

640.    59 Pain, 290 Pain, CXR, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma (or those working under their direction and control) created and submitted to Allstate (or caused the creation and submission of) records that falsely purported to justify the necessity of the medical services purportedly provided by Breeze MRI to Allstate insureds.

641.    59 Pain, 290 Pain, CXR, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma were responsible for: (a) directing the fraudulent services purportedly rendered on behalf of Allstate insureds through Breeze MRI; (b) creating, altering, and/or fabricating records submitted to Allstate in support of services purportedly rendered on behalf of Allstate insureds; (c) billing Allstate for the fraudulent medical services purportedly rendered on behalf of

Allstate insureds through Breeze MRI; (d) falsely charging for the services with the knowledge that these services were not lawfully reimbursable under applicable laws; and (e) billing Allstate for services that were, in most instances, never actually rendered as represented, Breeze MRI was caused to falsely claim eligibility each and every time that Breeze MRI sought reimbursement from Allstate.

642.    As alleged above, 59 Pain, 290 Pain, CXR, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma (or those persons working under their control) caused Breeze MRI to create and submit to Allstate claim reimbursement documents and demands for payment relative to services purportedly provided by Breeze MRI that were: (a) unlawful; (b) unnecessary; (c) fraudulent; and/or, (d) not actually provided as represented.

643.    Such conduct is unlawful, and rendered each such claim fraudulent under applicable state and federal laws.

644.    Many of the false, fraudulent, and unlawful acts, including, among other things, charging for services never actually rendered as represented, are not readily evident within the four corners of the documents submitted to Allstate by these Defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete claim at issue in this matter.

645.    Thus, every time that 59 Pain, 290 Pain, CXR, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma (along with those individuals working under their control) caused Breeze MRI to submit reimbursement demands to Allstate, 59 Pain, 290 Pain, CXR, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma (and those individuals working under their control) necessarily certified that Breeze MRI was, in all respects, eligible to be reimbursed under applicable state and federal laws.

646.     The full extent of 59 Pain, 290 Pain, CXR, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma's fraudulent and unlawful acts relative to their participation in the Breeze MRI enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

### D.     IPS – FRAUDULENT CONCEALMENT

647.     At all relevant times during the operation of the IPS enterprise, 59 Pain, 290 Pain, CXR, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma, purposely caused IPS to falsely certify that it was, in all respects, eligible to be reimbursed under applicable state and federal laws as a means to induce Allstate to promptly pay charges related to false, fraudulent, and unnecessary medical services purportedly provided to Allstate insureds.

648.     59 Pain, 290 Pain, CXR, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma (along with those individuals working under their control) purposely concealed the lack of necessity for the medical services purportedly provided and charged for by IPS.

649.     59 Pain, 290 Pain, CXR, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma (or those working under their direction and control) created and submitted to Allstate (or caused the creation and submission of) records that falsely purported to justify the necessity of the medical services purportedly provided by IPS to Allstate insureds.

650.     Because 59 Pain, 290 Pain, CXR, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma were responsible for: (a) directing the fraudulent services purportedly rendered on behalf of Allstate insureds through IPS; (b) creating, altering, and/or fabricating records submitted to Allstate in support of services purportedly rendered on behalf of Allstate insureds; (c) billing Allstate for the fraudulent medical services purportedly rendered on behalf of Allstate insureds through IPS; (d) falsely charging for the services with the knowledge

that these services were not lawfully reimbursable under applicable laws; and, (e) billing Allstate for services that were, in most instances, never actually provided, IPS was caused to falsely claim eligibility each and every time that IPS sought reimbursement from Allstate.

651.    As alleged above, 59 Pain, 290 Pain, CXR, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel and Sharma (or those persons working under their control) caused IPS to create and submit to Allstate claim reimbursement documents and demands for payment relative to services purportedly provided by IPS that were: (a) unlawful; (b) unnecessary; (c) fraudulent; and/or, (d) not actually provided as represented.

652.    Such conduct is unlawful, and rendered each such claim fraudulent under applicable state and federal laws.

653.    Many of the false, fraudulent, and unlawful acts, including, among other things, charging for services never actually provided, are not readily evident within the four corners of the documents submitted to Allstate by these Defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete claim at issue in this matter.

654.    Thus, every time that, Patel, Sharma, An, Casimir, CXR, and Innovo Management (along with those individuals working under their control) caused IPS to submit reimbursement demands to Allstate, Patel, Sharma, An, Casimir, CXR, and Innovo Management (and those individuals working under their control) necessarily certified that IPS was, in all respects, eligible to be reimbursed under applicable state and federal laws.

655.    The full extent of Patel, Sharma, An, Casimir, CXR, and Innovo Management's fraudulent and unlawful acts relative to their participation in the IPS enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

## VII.   ALLSTATE'S JUSTIFIABLE RELIANCE

656.   As the Defendants did not render lawful and reasonably necessary medical treatment, each bill and accompanying documentation mailed by or on behalf of the Defendants to Allstate constitutes a material misrepresentation.

657.   Each claim submitted to Allstate by (or on behalf of) 59 Pain, 290 Pain, Breeze MRI and IPS represented that the Defendants were legally eligible to be reimbursed.

658.   The facially valid documents submitted to Allstate by the Defendants were designed to, and did in fact, induce Allstate to rely on the documents.

659.   Allstate believed the Defendants bills and records (including the misrepresentations in every claim) and directly relied on those representations when making payments.

660.   The Defendants knew that the medical bills that contained false representations would be submitted by claimants and/or their counsel to Allstate seeking payments. Indeed, this was the defendants specific intent—that Allstate would believe and rely on these false statements in the defendants' medical records to induce it to make payments.

661.   The sole purpose of the Defendants making material misrepresentations in their medical bills and records was to steal from Allstate.

662.   Indeed, Allstate was a direct target of the defendants' fraud scheme.

663.   At all relevant times, the Defendants concealed from Allstate facts regarding the fact, lawfulness, and medical necessity of treatment and services allegedly provided by them to prevent Allstate from discovering that the claims submitted by and on behalf of the Defendants were not compensable under Texas law.

664.    These misrepresentations include submitting false medical documentation, including invoices, documenting the fact, lawfulness, and necessity of medical treatment and services in order to seek payment from Allstate.

665.    Evidence of the fraudulent scheme detailed in this Complaint was not discovered until after patterns had emerged and Allstate began to investigate the Defendants, revealing the true nature and full scope of their fraudulent scheme.

666.    Due to the Defendants' material misrepresentations and affirmative acts designed to conceal their fraudulent scheme, Allstate did not and could not have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

667.    In reliance on and as a result of the Defendants' misrepresentations, Allstate paid money to the defendants to its detriment.—monies that Allstate otherwise would not have paid if the defendants had provided true and accurate information.

668.    As a result, Allstate has paid in excess of $4,108,426.52 based upon the Defendants' false documentation and invoices.

## VIII.   **DAMAGES**

669.    Allstate's damages calculation includes those monies that it paid to Defendants in connection with first-party insurance claims.

670.    In addition, Allstate's damage calculation includes monies that it intended would be paid to the Defendants from the payments made to bodily-injury claimants.

671.    Allstate does not seek damages for anything more than what it considered to be due and payable to the defendants based on its reliance on the Defendants' bills and records.

672.    At the time it made these payments, Allstate was not aware of the fraud scheme alleged herein despite its reasonable due diligence because the defendants went to great lengths to fraudulently conceal their scheme.

673.    Had Allstate not been misled by the representations contained in the Defendants' documentation, no payments would have been made on these claims.

674.    All of the payments were made based on the Defendants' material misrepresentations.

675.    None of the payments identified in Exhibits 12-15 were for legitimate healthcare services.

676.    There is a direct relationship between the amount of the defendants fraudulent bills and the amount paid to claimants. *See* Exhibits 12-15.

677.    Indeed, Allstate intended and the defendants did, in fact, receive these payments identified in Exhibits 12-15.

678.    In addition, the Defendants' pattern of fraudulent conduct injured Allstate in its business and property by reason of the aforesaid violations of state and federal law. Although it is not necessary for Allstate to calculate its damages with specificity at this stage of the litigation (whereas Allstate's damages continue to accrue), Allstate's injury includes, but is not limited to, compensatory damages for payments wrongfully made to 59 Pain, 290 Pain, Breeze MRI, and IPS in connection with claims made under applicable state laws, the exact amount to be determined at trial, including:

(a)    Payments made to 59 Pain by Allstate in connection with first-party claims (totaling at least $196,683.86) as well as monies received by 59 Pain that were derived directly from Allstate's payments tendered in connection with the payment of third-party bodily injury claims (totaling at least $466,708.51) totaled at least $663,392.37, the exact amount to be determined at trial. The chart at Exhibit 12, incorporated herein as if set forth in its entirety, identifies Allstate's first-party payments to 59 Pain in connection

112

with claims determined to be false and fraudulent as of the filing of this Complaint and the monies received by 59 Pain as a direct result of Allstate's payment of third-party claims that have been determined to be fraudulent as of the filing of this Complaint.

(b) Payments made to 290 Pain by Allstate in connection with first-party claims (totaling at least $120,590.20) as well as monies received by 290 Pain that were derived directly from Allstate's payments tendered in connection with the payment of third-party bodily injury claims (totaling at least $591,611.40) totaled at least $712,201.60, the exact amount to be determined at trial. The chart at Exhibit 13, incorporated herein as if set forth in its entirety, identifies Allstate's first-party payments to 290 Pain in connection with claims determined to be false and fraudulent as of the filing of this Complaint and the monies received by 290 Pain as a direct result of Allstate's payment of third-party claims that have been determined to be fraudulent as of the filing of this Complaint.

(c) Payments made to Breeze MRI by Allstate in connection with first-party claims (totaling at least $246,077.39) as well as monies received by Breeze MRI that were derived directly from Allstate's payments tendered in connection with the payment of third-party bodily injury claims (totaling at least $2,365,071.80) totaled at least $2,611,149.19, the exact amount to be determined at trial. The chart at Exhibit 14, incorporated herein as if set forth in its entirety, identifies Allstate's first-party payments to Breeze MRI in connection with claims determined to be false and fraudulent as of the filing of this Complaint and the monies received by Breeze MRI as a direct result of Allstate's payment of third-party claims that have been determined to be fraudulent as of the filing of this Complaint.

(d) Payments made to IPS by Allstate in connection with first-party claims (totaling at least $786.48) as well as monies received by IPS that were derived directly from Allstate's payments tendered in connection with the payment of third-party bodily injury claims (totaling at least $120,896.88) totaled at least $121,683.36, the exact amount to be determined at trial. The chart at Exhibit 15, incorporated herein as if set forth in its entirety, identifies Allstate's first-party payments to IPS in connection with claims determined to be false and fraudulent as of the filing of this Complaint and the monies received by IPS as a direct result of Allstate's payment of third-party claims that have been determined to be fraudulent as of the filing of this Complaint.

## IX.   CAUSES OF ACTION

### COUNT I
### VIOLATION OF 18 U.S.C. § 1962(c)
### (59 Pain Enterprise)
### (Against CXR, Breeze MRI, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma)

679.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-678 as if set forth fully herein.

113

680.    59 Pain constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

681.    In connection with each of the claims identified in the within Complaint, CXR, Breeze MRI, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma (collectively, the "Count I Defendants") intentionally caused to be prepared and mailed false medical documentation by 59 Pain, or knew that such false medical documentation would be mailed in the ordinary course of 59 Pain's business, or should have reasonably foreseen the mailing of such false documentation by 59 Pain and/or by a personal injury attorney on behalf of a patient of 59 Pain would occur, in furtherance of the Count I Defendants' scheme to defraud.

682.    The Count I Defendants worked together to advance the alleged racketeering operation.

683.    Defendants, Le and Huynh owned, operated and controlled 59 Pain. They created false medical records and invoices to support medically unnecessary services that were not rendered as represented, if at all.

684.    Defendants Le and Huynh, through 59 Pain, participated in an improper and unlawful patient referral scheme wherein 59 Pain and/or Le and Huynh were paid by the Defendants, Innovo Management, IPS, An, Casimir, Patel, and Sharma, in cash or kind, for patient referrals.

685.    Had Defendants, Innovo Management, IPS, An, Casimir, Patel, and Sharma refrained from participating in the referral scheme with 59 Pain, then 59 Pain would not have been able to submit false records and invoices to the Allstate claimants as is set out in Exhibits 16-17.

686.    Defendants Le and Huynh, through 59 Pain, participated in an improper and unlawful referral scheme with CXR, Breeze MRI, HRX, Innovo Management, and IPS.

687.    Had the Defendants CRX, HRX, Innovo Management, IPS, An, Casimir, Patel, and Sharma refrained from participating in the improper referral scheme then 59 Pain would not have been able to successfully submit false records and bills to Allstate.

688.    The objective of the 59 Pain Enterprise was to extract money from Allstate by using false and fraudulent bills and records to induce Allstate to rely on these misrepresentations when making payments that the Defendants ultimately received.

689.    The mail fraud racketeering activity are related whereas the predicate acts all had the same objective of defrauding Allstate (and other insurance companies) by submitting false medical documentation though the US Mail to induce Allstate to rely on the defendants misrepresentations to make payments.

690.    The Count I Defendants' repeated predicate acts occurred over a substantial period of time exceeding years before being detected by Allstate.

691.    Allstate would not have allocated payments for the defendants' medical bills if it knew that the defendants' medical documentation was fraudulent.

692.    The Count I Defendants knew that two (2) or more mailings would be sent to demand and receive payment from Allstate, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 8.

693.    The Count I Defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by 59 Pain, which they knew would be billed by 59 Pain, and submitted to Allstate by 59 Pain and/or by a personal injury attorney on behalf of a patient of 59 Pain, in order to collect payment from Allstate.

694.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to 59 Pain for the benefit of the Count I Defendants that would not otherwise have been made.

695.    The Count I Defendants' pattern of fraudulent claims, each of which appeared legitimate on its face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count I Defendants to continue this unlawful scheme without being detected.

696.    By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count I Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

697.    The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to 59 Pain for the benefit of the Count I Defendants.

698.    The Count I Defendants participated in the conduct of the 59 Pain enterprise through a pattern of racketeering activities.

699.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I Defendants' conduct.

700.    The Count I Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

701.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Texas.

702.    By virtue of the Count I Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted

by them, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

**COUNT II**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(59 Pain Enterprise)**
**(Against CXR, Breeze MRI, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma)**

703.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-678 as if set forth fully herein.

704.    CXR, Breeze MRI, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma (collectively, the "Count II Defendants") conspired with others to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of 59 Pain.

705.    The Count II Defendants worked together to advance the alleged racketeering operation.

706.    Defendants, Le and Huynh owned, operated an controlled 59 Pain.  They created false medical records and invoices to support medically unnecessary services that were not rendered as represented, if at all.

707.    Defendants Le and Huynh, through 59 Pain, participated in an improper and unlawful patient referral scheme wherein 59 Pain and/or Le and Huynh were paid by the Defendants, Innovo Management, IPS, An, Casimir, Patel, and Sharma, in cash or kind, for patient referrals.

708.    Had Defendants, Innovo Management, IPS, An, Casimir, Patel, and Sharma refrained from participating in the referral scheme with 59 Pain, then 59 Pain would not have been able to submit false records and invoices to the Allstate claimants as is set out in Exhibits 16-17.

709.    The objective of the 59 Pain Enterprise was to extract money from Allstate by using false and fraudulent bills and records to induce Allstate to rely on these misrepresentations when making payments that the Defendants ultimately received.

710.    The mail fraud racketeering activity are related whereas the predicate acts all had the same objective of defrauding Allstate (and other insurance companies) by submitting false medical documentation though the US Mail to induce Allstate to rely on the defendants misrepresentations to make payments.

711.    The Count II Defendants' repeated predicate acts occurred over a substantial period of time exceeding years before being detected by Allstate.

712.    Allstate would not have allocated payments for the defendants' medical bills if it knew that the defendants' medical documentation was fraudulent.

713.    The Count II Defendants agreed to further, facilitate, support, and operate the 59 Pain enterprise.

714.    As such, the Count II Defendants conspired to violate 18 U.S.C. § 1962(c).

715.    The purpose of the conspiracy was to obtain payments from Allstate for healthcare services provided to patients through 59 Pain even though 59 Pain was not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count II Defendants.

716.    The Count II Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the unlawful operation and control of 59 Pain, the provision of false, fraudulent, and unnecessary healthcare services to 59 Pain patients, and the creation and submission to Allstate of false medical documentation that materially misrepresented 59 Pain's reimbursement eligibility.

717.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make payments to (or for the benefit of) 59 Pain as a result of the Count II Defendants' unlawful conduct described herein.

718.    By virtue of the Count II Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of the suit, including reasonable attorney's fees.

**COUNT III**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(290 Pain Enterprise)**
**(Against CXR, Breeze MRI, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma)**

719.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-678 as if set forth fully herein.

720.    290 Pain constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

721.    In connection with each of the claims identified in the within Complaint, CXR, Breeze MRI, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma (collectively, the "Count III Defendants") intentionally caused to be prepared and mailed false medical documentation by 290 Pain, or knew that such false medical documentation would be mailed in the ordinary course of 290 Pain's business, or should have reasonably foreseen the mailing of such false documentation by 290 Pain and/or by a personal injury attorney on behalf of a patient of 290 Pain would occur, in furtherance of the Count III Defendants' scheme to defraud.

722.    The Count III Defendants worked together to advance the alleged racketeering operation.

723.    Defendants, Le and Huynh owned, operated and controlled 290 Pain.  They created false medical records and invoices to support medically unnecessary services that were not rendered as represented, if at all.

724.    Defendants Le and Huynh, through 290 Pain, participated in an improper and unlawful patient referral scheme wherein 290 Pain and/or Le and Huynh were paid by the Defendants, Innovo Management, IPS, An, Casimir, Patel, and Sharma, in cash or kind, for patient referrals.

725.    Had Defendants, Innovo Management, IPS, An, Casimir, Patel, and Sharma chosen not to participate in the referral scheme with 290 Pain, then 290 Pain would not have been able to submit false records and invoices to the Allstate claimants as is set out in Exhibits 18-19.

726.    The objective of the 290 Pain Enterprise was to extract money from Allstate by using false and fraudulent bills and records to induce Allstate to rely on these misrepresentations when making payments that the Defendants ultimately received.

727.    The mail fraud racketeering activity are related whereas the predicate acts all had the same objective of defrauding Allstate (and other insurance companies) by submitting false medical documentation though the US Mail to induce Allstate to rely on the defendants misrepresentations to make payments.

728.    The Count III Defendants' repeated predicate acts occurred over a substantial period of time exceeding years before being detected by Allstate.

729.    Allstate would not have allocated payments for the defendants' medical bills if it knew that the defendants' medical documentation was fraudulent.

730.   The Count III Defendants knew that two (2) or more mailings would be sent to demand and receive payment from Allstate, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 9.

731.   The Count III Defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by 290 Pain, which they knew would be billed by 290 Pain, and submitted to Allstate by 290 Pain and/or by a personal injury attorney on behalf of a patient of 290 Pain, in order to collect payment from Allstate.

732.   As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to 290 Pain for the benefit of the Count III Defendants that would not otherwise have been made.

733.   The Count III Defendants' pattern of fraudulent claims, each of which appeared legitimate on its face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count III Defendants to continue this unlawful scheme without being detected.

734.   By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count III Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

735.   The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to 290 Pain for the benefit of the Count III Defendants.

736.   The Count III Defendants participated in the conduct of the 290 Pain enterprise through a pattern of racketeering activities.

737.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count III Defendants' conduct.

738.    The Count III Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

739.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Texas.

740.    Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

741.    By virtue of the Count III Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

## COUNT IV
### VIOLATION OF 18 U.S.C. § 1962(d)
### (290 Pain Enterprise)
### (Against CXR, Breeze MRI, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma)

742.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-678 as if set forth fully herein.

743.    CXR, Breeze MRI, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma (collectively, the "Count IV Defendants") conspired with others to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of 290 Pain.

744.    The Count IV Defendants worked together to advance the alleged racketeering operation.

745.    Defendants, Le and Huynh owned, operated an controlled 290 Pain.  They created false medical records and invoices to support medically unnecessary services that were not rendered as represented, if at all.

746.    Defendants Le and Huynh, through 290 Pain, participated in an improper and unlawful patient referral scheme wherein 290 Pain and/or Le and Huynh were paid by the Defendants, Innovo Management, IPS, An, Casimir, Patel, and Sharma, in cash or kind, for patient referrals.

747.    Had Defendants, Innovo Management, IPS, An, Casimir, Patel, and Sharma chosen not to participate in the referral scheme with 290 Pain, then 290 Pain would not have been able to submit false records and invoices to the Allstate claimants as is set out in Exhibits 18-19.

748.    The objective of the 290 Pain Enterprise was to extract money from Allstate by using false and fraudulent bills and records to induce Allstate to rely on these misrepresentations when making payments that the Defendants ultimately received.

749.    The mail fraud racketeering activity are related whereas the predicate acts all had the same objective of defrauding Allstate (and other insurance companies) by submitting false medical documentation though the US Mail to induce Allstate to rely on the defendants misrepresentations to make payments.

750.    The Count IV Defendants' repeated predicate acts occurred over a substantial period of time exceeding years before being detected by Allstate.

751.    Allstate would not have allocated payments for the defendants' medical bills if it knew that the defendants' medical documentation was fraudulent.

752.    The Count IV Defendants agreed to further, facilitate, support, and operate the 290 Pain enterprise.

753.     As such, the Count IV Defendants conspired to violate 18 U.S.C. § 1962(c).

754.     The purpose of the conspiracy was to obtain payments from Allstate for healthcare services provided to patients through 290 Pain even though 290 Pain was not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count IV Defendants.

755.     The Count IV Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the unlawful operation and control of 290 Pain, the provision of false, fraudulent, and unnecessary healthcare services to 290 Pain patients, and the creation and submission to Allstate of false medical documentation that materially misrepresented 290 Pain's reimbursement eligibility.

756.     Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make payments to (or for the benefit of) 290 Pain as a result of the Count IV Defendants' unlawful conduct described herein.

757.     By virtue of the Count IV Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of the suit, including reasonable attorney's fees.

## <u>COUNT V</u>
### VIOLATION OF 18 U.S.C. § 1962(c)
#### (Breeze MRI Enterprise)
#### (Against 59 Pain, 290 Pain, CXR, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma)

758.     Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-678 as if set forth fully herein.

759.    Breeze MRI constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

760.    In connection with each of the claims identified in the within Complaint, 59 Pain, 290 Pain, CXR, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma (collectively, the "Count V Defendants") intentionally caused to be prepared and mailed false medical documentation by Breeze MRI, or knew that such false medical documentation would be mailed in the ordinary course of Breeze MRI business, or should have reasonably foreseen the mailing of such false documentation by Breeze MRI and/or by a personal injury attorney on behalf of a patient of Breeze MRI would occur, in furtherance of the Count V Defendants' scheme to defraud.

761.    The Count V Defendants worked together to advance the alleged racketeering operation.

762.    Defendant, Patel owned, operated and controlled Breeze MRI.  He created false medical records and invoices to support medically unnecessary services that were not rendered as represented, if at all, to support the medical treatment ordered by 59 Pain, 290 Pain, and IPS.

763.    Defendant Patel, through Breeze MRI, participated in an improper and unlawful patient referral scheme wherein the Defendants, 59 Pain, 290 Pain, Innovo Management, IPS, An, Casimir, and Sharma, referred patients to Breeze MRI in exchange of payment, in cash or in kind.

764.    Had Defendants, 59 Pain, 290 Pain, CXR, HRX, Innovo Management, IPS, An, Casimir, Patel, and Sharma chosen not to participate in the referral scheme with Breeze MRI, then Breeze MRI would not have been able to submit false records and invoices to the Allstate claimants as is set out in Exhibits 16 and 18.

765.     The objective of the Breeze MRI Enterprise was to extract money from Allstate by using false and fraudulent bills and records to induce Allstate to rely on these misrepresentations when making payments that the Defendants ultimately received.

766.     The mail fraud racketeering activity are related whereas the predicate acts all had the same objective of defrauding Allstate (and other insurance companies) by submitting false medical documentation though the US Mail to induce Allstate to rely on the defendants misrepresentations to make payments.

767.     The Count V Defendants' repeated predicate acts occurred over a substantial period of time exceeding years before being detected by Allstate.

768.     Allstate would not have allocated payments for the defendants' medical bills if it knew that the defendants' medical documentation was fraudulent.

769.     The Count V Defendants knew that two (2) or more mailings would be sent to demand and receive payment from Allstate, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 10.

770.     The Count V Defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Breeze MRI, which they knew would be billed by Breeze MRI, and submitted to Allstate by Breeze MRI and/or by a personal injury attorney, in order to collect payment from Allstate.

771.     As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Breeze MRI for the benefit of the Count V Defendants that would not otherwise have been made.

772.     The Count V Defendants' pattern of fraudulent claims, each of which appeared legitimate on its face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count V Defendants to continue this unlawful scheme without being detected.

773.     By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count V Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

774.     The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Breeze MRI for the benefit of the Count V Defendants.

775.     The Count V Defendants participated in the conduct of the Breeze MRI enterprise through a pattern of racketeering activities.

776.     Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count V Defendants' conduct.

777.     The Count V Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

778.     Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Texas.

779.     By virtue of the Count V Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

## COUNT VI
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Breeze MRI)
### (Against 59 Pain, 290 Pain, CXR, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma)

780.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-678 as if set forth fully herein.

781.    59 Pain, 290 Pain, CXR, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma (collectively, the "Count VI Defendants") conspired with others to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of Breeze MRI.

782.    The Count VI Defendants worked together to advance the alleged racketeering operation.

783.    Defendant, Patel owned, operated and controlled Breeze MRI.  He created false medical records and invoices to support medically unnecessary services that were not rendered as represented, if at all, to support the medical treatment ordered by 59 Pain, 290 Pain, and IPS.

784.    Defendant Patel, through Breeze MRI, participated in an improper and unlawful patient referral scheme wherein the Defendants, 59 Pain and 290 Pain Innovo Management, IPS, An, Casimir, and Sharma, referred patients to Breeze MRI in exchange of payment, in cash or in kind.

785.    Had Defendants, 59 Pain, 290 Pain, CXR, HRX, Innovo Management, IPS, An, Casimir, Patel, and Sharma chosen not to participate in the referral scheme with Breeze MRI, then Breeze MRI would not have been able to submit false records and invoices to the Allstate claimants as is set out in Exhibits 16 and 18.

786.    The objective of the Breeze MRI Enterprise was to extract money from Allstate by using false and fraudulent bills and records to induce Allstate to rely on these misrepresentations when making payments that the Defendants ultimately received.

787.    The mail fraud racketeering activity are related whereas the predicate acts all had the same objective of defrauding Allstate (and other insurance companies) by submitting false medical documentation though the US Mail to induce Allstate to rely on the defendants misrepresentations to make payments.

788.    The Count VI Defendants' repeated predicate acts occurred over a substantial period of time exceeding years before being detected by Allstate.

789.    Allstate would not have allocated payments for the defendants' medical bills if it knew that the defendants' medical documentation was fraudulent.

790.    The Count VI Defendants agreed to further, facilitate, support, and operate the Breeze MRI enterprise.

791.    As such, the Count VI Defendants conspired to violate 18 U.S.C. § 1962(c).

792.    The purpose of the conspiracy was to obtain payments from Allstate for healthcare services provided to patients through Breeze MRI, even though Breeze MRI was not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count VI Defendants.

793.    The Count VI Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the unlawful operation and control of Breeze MRI, the provision of false, fraudulent, and unnecessary healthcare services to Breeze MRI patients, and the creation and submission to Allstate of false medical documentation that materially misrepresented Breeze MRI's reimbursement eligibility.

794.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make payments to (or for the benefit of) Breeze MRI as a result of the Count VI Defendants' unlawful conduct described herein.

795.    By virtue of the Count VI Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the Defendants identified, three times the damages sustained by reason of the claims submitted by the Defendants, and others acting in concert with them, together with the costs of the suit, including reasonable attorney's fees.

**COUNT VII**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(CXR Enterprise)**
**(Against 59 Pain, 290 Pain, Breeze MRI, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma)**

796.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-678 as if set forth fully herein.

797.    CXR constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

798.    In connection with each of the claims identified in the within Complaint, 59 Pain, 290 Pain, Breeze MRI, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma (collectively, the "Count VII Defendants"), through CXR, intentionally caused to be prepared and mailed false medical documentation by 59 Pain, 290 Pain, Breeze MRI, and IPS, or knew that such false medical documentation would be mailed in the ordinary course of 59 Pain, 290 Pain, Breeze MRI, and IPS's business, or should have reasonably foreseen the mailing of such false documentation by 59 Pain, 290 Pain, Breeze MRI, and IPS and/or by a personal injury attorney on behalf of a patient of 59 Pain, 290 Pain, Breeze MRI, and IPS would occur, in furtherance of the Count VII Defendants' scheme to defraud.

799.    The Count VII Defendants worked together to advance the alleged racketeering operation.

800.    Defendant, Patel owned, operated and controlled CXR.  He engaged in an improper and unlawful referral scheme with Defendants 59 Pain, 290 Pain, Breeze MRI, Innovo Management, HRX, IPS, An, Casimir,  and Sharma wherein kickbacks were paid in exchange for medically unnecessary medical treatment.

801.    Had Defendants, 59 Pain, 290 Pain, Breeze MRI, Innovo Management, HRX, IPS, An, Casimir, Patel, and Sharma chosen not to participate in the referral scheme with CXR, then CXR would not have been able to profit from false records and invoices submitted by 59 Pain, 290 Pain, Breeze MRI, and IPS to the Allstate claimants as is set out in Exhibits 16-19.

802.    The objective of the CXR Enterprise was to extract money from Allstate by using false and fraudulent bills and records to induce Allstate to rely on these misrepresentations when making payments that the Defendants ultimately received.

803.    The mail fraud racketeering activity are related whereas the predicate acts all had the same objective of defrauding Allstate (and other insurance companies) by submitting false medical documentation though the US Mail to induce Allstate to rely on the defendants misrepresentations to make payments.

804.    The Count VII Defendants' repeated predicate acts occurred over a substantial period of time exceeding years before being detected by Allstate.

805.    Allstate would not have allocated payments for the defendants' medical bills if it knew that the defendants' medical documentation was fraudulent.

806.    The Count VII Defendants knew that two (2) or more mailings would be sent to demand and receive payment from Allstate, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibits 8-11.

807.    The Count VII Defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by 59 Pain, 290 Pain, Breeze MRI, and IPS, which they knew would be billed by 59 Pain, 290 Pain, Breeze MRI, and IPS, and submitted to Allstate by 59 Pain, 290 Pain, Breeze MRI, and IPS and/or by a personal injury attorney on behalf of a patient of 59 Pain, 290 Pain, Breeze MRI, and IPS, in order to collect payment from Allstate.

808.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to 59 Pain, 290 Pain, Breeze MRI, and IPS for the benefit of the Count VII Defendants that would not otherwise have been made.

809.    The Count VII Defendants' pattern of fraudulent claims, each of which appeared legitimate on its face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count VII Defendants to continue this unlawful scheme without being detected.

810.    By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count VII Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

811.    The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to 59 Pain, 290 Pain, Breeze MRI, and IPS for the benefit of the Count VII Defendants.

812.     The Count VII Defendants participated in the conduct of the CRX enterprise through a pattern of racketeering activities.

813.     Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count VII Defendants' conduct.

814.     The Count VII Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

815.     Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Texas.

816.     By virtue of the Count VII Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

## COUNT VIII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (CXR Enterprise)
### (Against 59 Pain, 290 Pain, Breeze MRI, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma)

817.     Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-678 as if set forth fully herein.

818.     59 Pain, 290 Pain, Breeze MRI, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma (collectively, the "Count VIII Defendants") conspired with others to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of CXR

819.     Defendant, Patel owned, operated and controlled CXR.  He engaged in an improper and unlawful referral scheme with Defendants 59 Pain, 290 Pain, Breeze MRI, Innovo

Management, HRX, IPS, An, Casimir, and Sharma wherein kickbacks were paid in exchange for medically unnecessary medical treatment.

820.    Had Defendants, 59 Pain, 290 Pain, Breeze MRI, Innovo Management, HRX, IPS, An, Casimir, Patel, and Sharma chosen not to participate in the referral scheme with CXR, then CXR would not have been able to profit from false records and invoices submitted by 59 Pain, 290 Pain, Breeze MRI, and IPS to the Allstate claimants as is set out in Exhibits 16-19.

821.    The objective of the CXR Enterprise was to extract money from Allstate by using false and fraudulent bills and records to induce Allstate to rely on these misrepresentations when making payments that the Defendants ultimately received.

822.    The mail fraud racketeering activity are related whereas the predicate acts all had the same objective of defrauding Allstate (and other insurance companies) by submitting false medical documentation though the US Mail to induce Allstate to rely on the defendants misrepresentations to make payments.

823.    The Count VIII Defendants' repeated predicate acts occurred over a substantial period of time exceeding years before being detected by Allstate.

824.    Allstate would not have allocated payments for the defendants' medical bills if it knew that the defendants' medical documentation was fraudulent.

825.    The Count VIII Defendants agreed to further, facilitate, support, and operate 59 Pain, 290 Pain, Breeze MRI, and IPS, through CXR.

826.    As such, the Count VIII Defendants conspired to violate 18 U.S.C. § 1962(c).

827.    The purpose of the conspiracy was to obtain payments from Allstate for healthcare services provided to patients through 59 Pain, 290 Pain, Breeze MRI, and IPS even though 59

Pain, 290 Pain, Breeze MRI, and IPS were not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count VIII Defendants.

828.    The Count VIII Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the unlawful operation and control of 59 Pain, 290 Pain, Breeze MRI, and IPS, the provision of false, fraudulent, and unnecessary healthcare services to 59 Pain, 290 Pain, Breeze MRI, and IPS patients, and the creation and submission to Allstate of false medical documentation that materially misrepresented 59 Pain, 290 Pain, Breeze MRI, and IPS's reimbursement eligibility.

829.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make payments to (or for the benefit of) 59 Pain, 290 Pain, Breeze MRI, and IPS as a result of the Count VIII Defendants' unlawful conduct described herein.

830.    By virtue of the Count VIII Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of the suit, including reasonable attorney's fees.

## <u>COUNT IX</u>
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(HRX Enterprise)**
**(Against 59 Pain, 290 Pain, Breeze MRI, CXR, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma)**

831.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-678 as if set forth fully herein.

832.    HRX constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

833.    In connection with each of the claims identified in the within Complaint, 59 Pain, 290 Pain, Breeze MRI, CXR, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma (collectively, the "Count IX Defendants"), through HRX, intentionally caused to be prepared and mailed false medical documentation by 59 Pain, 290 Pain, Breeze MRI, and IPS, or knew that such false medical documentation would be mailed in the ordinary course of 59 Pain, 290 Pain, Breeze MRI, and IPS's business, or should have reasonably foreseen the mailing of such false documentation by 59 Pain, 290 Pain, Breeze MRI, and IPS and/or by a personal injury attorney on behalf of a patient of 59 Pain, 290 Pain, Breeze MRI, and IPS would occur, in furtherance of the Count IX Defendants' scheme to defraud.

834.    Defendant, Sharma, owned, operated and controlled HRX.  He engaged in an improper and unlawful referral scheme with Defendants 59 Pain, 290 Pain, Breeze MRI, Innovo Management, CXR, IPS, An, Casimir, and Patel wherein kickbacks were paid in exchange for medically unnecessary medical treatment.

835.    Had Defendants, 59 Pain, 290 Pain, Breeze MRI, Innovo Management, CXR, IPS, An, Casimir, Patel, and Sharma chosen not to participate in the referral scheme with HRX, then HRX would not have been able to profit from false records and invoices submitted by 59 Pain, 290 Pain, Breeze MRI, and IPS to the Allstate claimants as is set out in Exhibits 16-19.

836.    The objective of the HRX Enterprise was to extract money from Allstate by using false and fraudulent bills and records to induce Allstate to rely on these misrepresentations when making payments that the Defendants ultimately received.

837.    The mail fraud racketeering activity are related whereas the predicate acts all had the same objective of defrauding Allstate (and other insurance companies) by submitting false

medical documentation though the US Mail to induce Allstate to rely on the defendants misrepresentations to make payments.

838.    The Count IX Defendants' repeated predicate acts occurred over a substantial period of time exceeding years before being detected by Allstate.

839.    Allstate would not have allocated payments for the defendants' medical bills if it knew that the defendants' medical documentation was fraudulent.

840.    The Count IX Defendants knew that two (2) or more mailings would be sent to demand and receive payment from Allstate, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibits 8-11.

841.    The Count IX Defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by 59 Pain, 290 Pain, Breeze MRI, and IPS, which they knew would be billed by 59 Pain, 290 Pain, Breeze MRI, and IPS, and submitted to Allstate by 59 Pain, 290 Pain, Breeze MRI, and IPS and/or by a personal injury attorney on behalf of a patient of 59 Pain, 290 Pain, Breeze MRI, and IPS, in order to collect payment from Allstate.

842.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to 59 Pain, 290 Pain, Breeze MRI, and IPS for the benefit of the Count IX Defendants that would not otherwise have been made.

843.    The Count IX Defendants' pattern of fraudulent claims, each of which appeared legitimate on its face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count IX Defendants to continue this unlawful scheme without being detected.

844.    By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count IX Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

845.    The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to 59 Pain, 290 Pain, Breeze MRI, and IPS for the benefit of the Count IX Defendants.

846.    The Count IX Defendants participated in the conduct of the HRX enterprise through a pattern of racketeering activities.

847.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count IX Defendants' conduct.

848.    The Count IX Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

849.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Texas.

850.    By virtue of the Count IX Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

## COUNT X
### VIOLATION OF 18 U.S.C. § 1962(d)
### (HRX Enterprise)
### (Against 59 Pain, 290 Pain, Breeze MRI, CXR, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma)

851.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-678 as if set forth fully herein.

852. 59 Pain, 290 Pain, Breeze MRI, CXR, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma (collectively, the "Count X Defendants") conspired with others to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of HRX.

853. Defendant, Sharma, owned, operated and controlled HRX. He engaged in an improper and unlawful referral scheme with Defendants 59 Pain, 290 Pain, Breeze MRI, Innovo Management, CXR, IPS, An, Casimir, and Patel wherein kickbacks were paid in exchange for medically unnecessary medical treatment.

854. Had Defendants, 59 Pain, 290 Pain, Breeze MRI, Innovo Management, CXR, IPS, An, Casimir, Patel, and Sharma chosen not to participate in the referral scheme with CXR, then CXR would not have been able to profit from false records and invoices submitted by 59 Pain, 290 Pain, Breeze MRI, and IPS to the Allstate claimants as is set out in Exhibits 16-19.

855. The objective of the HRX Enterprise was to extract money from Allstate by using false and fraudulent bills and records to induce Allstate to rely on these misrepresentations when making payments that the Defendants ultimately received.

856. The mail fraud racketeering activity are related whereas the predicate acts all had the same objective of defrauding Allstate (and other insurance companies) by submitting false medical documentation though the US Mail to induce Allstate to rely on the defendants misrepresentations to make payments.

857. The Count X Defendants' repeated predicate acts occurred over a substantial period of time exceeding years before being detected by Allstate.

858. Allstate would not have allocated payments for the defendants' medical bills if it knew that the defendants' medical documentation was fraudulent.

859.    The Count X Defendants agreed to further, facilitate, support, and operate 59 Pain, 290 Pain, Breeze MRI, and IPS through HRX.

860.    As such, the Count X Defendants conspired to violate 18 U.S.C. § 1962(c).

861.    The purpose of the conspiracy was to obtain payments from Allstate for healthcare services provided to patients through 59 Pain, 290 Pain, Breeze MRI, and IPS even though 59 Pain, 290 Pain, Breeze MRI, and IPS were not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count X Defendants.

862.    The Count X Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the unlawful operation and control of 59 Pain, 290 Pain, Breeze MRI, and IPS, the provision of false, fraudulent, and unnecessary healthcare services to 59 Pain, 290 Pain, Breeze MRI, and IPS patients, and the creation and submission to Allstate of false medical documentation that materially misrepresented 59 Pain, 290 Pain, Breeze MRI, and IPS's reimbursement eligibility.

863.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make payments to (or for the benefit of) 59 Pain, 290 Pain, Breeze MRI, and IPS as a result of the Count X Defendants' unlawful conduct described herein.

864.    By virtue of the Count X Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of the suit, including reasonable attorney's fees.

## COUNT XI
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Innovo Management Enterprise)
### (Against 59 Pain, 290 Pain, Breeze MRI, CXR, HRX, IPS, An, Casimir, Huynh, Le, Patel, and Sharma)

865.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-678 as if set forth fully herein.

866.    Innovo Management constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

867.    In connection with each of the claims identified in the within Complaint, 59 Pain, 290 Pain, Breeze MRI, CXR, HRX, IPS, An, Casimir, Huynh, Le, Patel, and Sharma (collectively, the "Count XI Defendants"), through Innovo Management, intentionally caused to be prepared and mailed false medical documentation by 59 Pain, 290 Pain, Breeze MRI, and IPS, or knew that such false medical documentation would be mailed in the ordinary course of 59 Pain, 290 Pain, Breeze MRI, and IPS's business, or should have reasonably foreseen the mailing of such false documentation by 59 Pain, 290 Pain, Breeze MRI, and IPS and/or by a personal injury attorney on behalf of a patient of 59 Pain, 290 Pain, Breeze MRI, and IPS would occur, in furtherance of the Count XI Defendants' scheme to defraud.

868.    The objective of the Innovo Management Enterprise was to extract money from Allstate by using false and fraudulent bills and records to induce Allstate to rely on these misrepresentations when making payments that the Defendants ultimately received.

869.    The mail fraud racketeering activity are related whereas the predicate acts all had the same objective of defrauding Allstate (and other insurance companies) by submitting false medical documentation though the US Mail to induce Allstate to rely on the defendants misrepresentations to make payments.

141

870.    The Count XI Defendants' repeated predicate acts occurred over a substantial period of time exceeding years before being detected by Allstate.

871.    Allstate would not have allocated payments for the defendants' medical bills if it knew that the defendants' medical documentation was fraudulent.

872.    The Count XI Defendants knew that two (2) or more mailings would be sent to demand and receive payment from Allstate, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibits 8-11.

873.    The Count XI Defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by 59 Pain, 290 Pain, Breeze MRI, and IPS, which they knew would be billed by 59 Pain, 290 Pain, Breeze MRI, and IPS, and submitted to Allstate by 59 Pain, 290 Pain, Breeze MRI, and IPS and/or by a personal injury attorney on behalf of a patient of 59 Pain, 290 Pain, Breeze MRI, and IPS, in order to collect payment from Allstate.

874.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to 59 Pain, 290 Pain, Breeze MRI, and IPS for the benefit of the Count XI Defendants that would not otherwise have been made.

875.    The Count XI Defendants' pattern of fraudulent claims, each of which appeared legitimate on its face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XI Defendants to continue this unlawful scheme without being detected.

876.    By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count XI Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

877.    The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to 59 Pain, 290 Pain, Breeze MRI, and IPS for the benefit of the Count XI Defendants.

878.    The Count XI Defendants participated in the conduct of the Innovo Management enterprise through a pattern of racketeering activities.

879.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XI Defendants' conduct.

880.    The Count XI Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

881.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Texas.

882.    By virtue of the Count XI Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

## COUNT XII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Innovo Management Enterprise)
### (Against 59 Pain, 290 Pain, Breeze MRI, CXR, HRX, IPS, An, Casimir, Huynh, Le, Patel, and Sharma)

883.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-678 as if set forth fully herein.

884.    59 Pain, 290 Pain, Breeze MRI, CXR, HRX, IPS, An, Casimir, Huynh, Le, Patel, and Sharma (collectively, the "Count XII Defendants") conspired with others to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of Innovo Management.

885.    The objective of the Innovo Management Enterprise was to extract money from Allstate by using false and fraudulent bills and records to induce Allstate to rely on these misrepresentations when making payments that the Defendants ultimately received.

886.    The mail fraud racketeering activity are related whereas the predicate acts all had the same objective of defrauding Allstate (and other insurance companies) by submitting false medical documentation though the US Mail to induce Allstate to rely on the defendants misrepresentations to make payments.

887.    The Count XII Defendants' repeated predicate acts occurred over a substantial period of time exceeding years before being detected by Allstate.

888.    Allstate would not have allocated payments for the defendants' medical bills if it knew that the defendants' medical documentation was fraudulent.

889.    The Count XII Defendants agreed to further, facilitate, support, and operate 59 Pain, 290 Pain, Breeze MRI, and IPS.

890.    As such, the Count XII Defendants conspired to violate 18 U.S.C. § 1962(c).

891.    The purpose of the conspiracy was to obtain payments from Allstate for healthcare services provided to patients through 59 Pain, 290 Pain, Breeze MRI, and IPS even though 59 Pain, 290 Pain, Breeze MRI, and IPS were not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count XII Defendants.

892.    The Count XII Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the unlawful operation and control of 59 Pain, 290

Pain, Breeze MRI, and IPS, the provision of false, fraudulent, and unnecessary healthcare services to 59 Pain, 290 Pain, Breeze MRI, and IPS patients, and the creation and submission to Allstate of false medical documentation that materially misrepresented 59 Pain, 290 Pain, Breeze MRI, and IPS's reimbursement eligibility.

893.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make payments to (or for the benefit of) 59 Pain, 290 Pain, Breeze MRI, and IPS as a result of the Count XII Defendants' unlawful conduct described herein.

894.    By virtue of the Count XII Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of the suit, including reasonable attorney's fees.

## COUNT XIII
## VIOLATION OF 18 U.S.C. § 1962(c)
### (IPS Enterprise)
**(Against 59 Pain, 290 Pain, Breeze MRI, CXR, HRX, Innovo Management, An, Casimir, Huynh, Le, Patel, and Sharma)**

895.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-678 as if fully set forth herein.

896.    IPS constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

897.    In connection with each of the claims identified in the within Complaint, 59 Pain, 290 Pain, Breeze MRI, CXR, HRX, Innovo Management, An, Casimir, Huynh, Le, Patel, and Sharma (collectively, the "Count XIII Defendants") intentionally caused to be prepared and mailed false medical documentation by IPS, or knew that such false medical documentation would be

mailed in the ordinary course of IPS's business, or should have reasonably foreseen the mailing of such false documentation by IPS and/or by a personal injury attorney on behalf of a patient of IPS would occur, in furtherance of the Count XIII Defendants' scheme to defraud.

898.    Defendants, An and Casimir, owned, operated and controlled IPS.  They created false medical records and invoices to support medically unnecessary services that were not rendered as represented, if at all, to support the medical treatment ordered by 59 Pain, 290 Pain, and IPS.

899.    Defendants An and Casimir, through IPS, participated in an improper and unlawful patient referral scheme wherein the Defendants, 59 Pain, 290 Pain, Breeze MRI, Innovo Management, CRX, and HRX referred patients to IPS in exchange of payment, in cash or in kind.

900.    Had Defendants, 59 Pain, 290 Pain, Breeze MRI, Innovo Management, CRX, HRX, An, Casimir, Patel, and Sharma chosen not to participate in the referral scheme with IPS, then IPS would not have been able to profit from false records and invoices submitted by 59 Pain, 290 Pain, Breeze MRI, and IPS to the Allstate claimants as is set out in Exhibits 16-19.

901.    Defendants An and Casimir, through IPS, also relinquished control of medical decision at its facility to laypersons, Sharma and Patel, and their companies, CXR, HRX, and Innovo Management in violation of Texas law.

902.    The objective of the IPS Enterprise was to extract money from Allstate by using false and fraudulent bills and records to induce Allstate to rely on these misrepresentations when making payments that the Defendants ultimately received.

903.    The mail fraud racketeering activity are related whereas the predicate acts all had the same objective of defrauding Allstate (and other insurance companies) by submitting false

medical documentation though the US Mail to induce Allstate to rely on the defendants misrepresentations to make payments.

904.    The Count XIII Defendants' repeated predicate acts occurred over a substantial period of time exceeding years before being detected by Allstate.

905.    Allstate would not have allocated payments for the defendants' medical bills if it knew that the defendants' medical documentation was fraudulent.

906.    The Count XIII Defendants knew that two (2) or more mailings would be sent to demand and receive payment from Allstate, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 11.

907.    The Count XIII Defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by IPS, which they knew would be billed by IPS, and submitted to Allstate by IPS and/or by a personal injury attorney on behalf of a patient of IPS, in order to collect payment from Allstate.

908.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to IPS for the benefit of the Count XIII Defendants that would not otherwise have been made.

909.    The Count XIII Defendants' pattern of fraudulent claims, each of which appeared legitimate on its face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XIII Defendants to continue this unlawful scheme without being detected.

910.    By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count XIII Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

911.    The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to IPS for the benefit of the Count XIII Defendants.

912.    The Count XIII Defendants participated in the conduct of the IPS enterprise through a pattern of racketeering activities.

913.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XIII Defendants' conduct.

914.    The Count XIII Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

915.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Texas.

916.    By virtue of the Count XIII Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

### COUNT XIV
### VIOLATION OF 18 U.S.C. § 1962(d)
### (IPS Enterprise)
### (Against 59 Pain, 290 Pain, Breeze MRI, CXR, HRX, Innovo Management, An, Casimir, Huynh, Le, Patel, and Sharma)

917.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-678 as if set forth fully herein.

918.    59 Pain, 290 Pain, Breeze MRI, CXR, HRX, Innovo Management, An, Casimir, Huynh, Le, Patel, and Sharma (collectively, the "Count XIV Defendants") conspired with others to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of 59 Pain. Defendants, An and Casimir, owned, operated and controlled IPS. They created false medical records and invoices to support medically unnecessary services that were not rendered as represented, if at all, to support the medical treatment ordered by 59 Pain, 290 Pain, and IPS.

919.    Defendants An and Casimir, through IPS, participated in an improper and unlawful patient referral scheme wherein the Defendants, 59 Pain, 290 Pain, Breeze MRI, Innovo Management, CRX, and HRX referred patients to IPS in exchange of payment, in cash or in kind.

920.    Had Defendants, 59 Pain, 290 Pain, Breeze MRI, Innovo Management, CRX, HRX, An, Casimir, Patel, and Sharma chosen not to participate in the referral scheme with IPS, then IPS would not have been able to profit from false records and invoices submitted by 59 Pain, 290 Pain, Breeze MRI, and IPS to the Allstate claimants as is set out in Exhibits 16-19.

921.    Defendants An and Casimir, through IPS, also relinquished control of medical decision at its facility to laypersons, Sharma and Patel, and their companies, CXR, HRX, and Innovo Management in violation of Texas law

922.    The objective of the IPS Enterprise was to extract money from Allstate by using false and fraudulent bills and records to induce Allstate to rely on these misrepresentations when making payments that the Defendants ultimately received.

923.    The mail fraud racketeering activity are related whereas the predicate acts all had the same objective of defrauding Allstate (and other insurance companies) by submitting false medical documentation though the US Mail to induce Allstate to rely on the defendants misrepresentations to make payments.

924.    The Count XIV Defendants' repeated predicate acts occurred over a substantial period of time exceeding years before being detected by Allstate.

925.    Allstate would not have allocated payments for the defendants' medical bills if it knew that the defendants' medical documentation was fraudulent.

926.    The Count XIV Defendants agreed to further, facilitate, support, and operate the 59 Pain enterprise.

927.    As such, the Count XIV Defendants conspired to violate 18 U.S.C. § 1962(c).

928.    The purpose of the conspiracy was to obtain payments from Allstate for healthcare services provided to patients through IPS even though IPS was not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count XIV Defendants.

929.    The Count XIV Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the unlawful operation and control of IPS, the provision of false, fraudulent, and unnecessary healthcare services to IPS patients, and the creation and submission to Allstate of false medical documentation that materially misrepresented 59 Pain's reimbursement eligibility.

930.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make payments to (or for the benefit of) IPS as a result of the Count XIV Defendants' unlawful conduct described herein.

931.    By virtue of the Count XIV Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of the suit, including reasonable attorney's fees.

## COUNT XV
## COMMON LAW FRAUD
### Against All Defendants

932.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-678 as if set forth fully herein.

933.    The scheme to defraud perpetrated by 59 Pain, 290 Pain, Breeze MRI, CXR, HRX, Innovo Management, IPS, An, Casimir, Huynh, and Le, Patel, and Sharma (collectively, the "Count XV Defendants") was dependent upon a succession of material misrepresentations of fact that the Count XV Defendants were actually and lawfully rendering medically necessary treatment and services and were entitled to collect payments from Allstate.

934.    The false representations made by the Count XV Defendants include, but are not limited to, those discussed in the medical documentation submitted to Allstate concerning the legitimacy of healthcare services purportedly provided to patients, and the actual ownership and control of 59 Pain, 290 Pain, Breeze MRI, and IPS.

935.    The Count XV Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

936.    The misrepresentations were intentionally made by the Count XV Defendants in furtherance of their scheme to defraud and deceive Allstate by submitting, causing to be submitted, and/or knowing that fraudulent claims for payment would be submitted to Allstate.

937.    The Count XV Defendants' misrepresentations were known by them to be false, or were made in reckless disregard of the truth, and were made for the purpose of inducing Allstate to make payments for claims that are not compensable under Texas law.

938.    Allstate justifiably relied upon such material misrepresentations to its detriment in paying numerous non-meritorious bills for medical expenses pursuant to insurance claims and in

incurring expenses related to the adjustment and processing of claims submitted by and on behalf of the Count XV Defendants.

939.    As a direct and proximate result of the Count XV Defendants' fraudulent representations and acts, Allstate has been damaged as previously described herein.

**COUNT XVI**
**CIVIL CONSPIRACY TO COMMIT FRAUD**
**Against All Defendants**

940.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-678 as if set forth fully herein.

941.    59 Pain, 290 Pain, Breeze MRI, CXR, HRX,  Innovo Management, IPS, An, Casimir, Huynh, and Le, Patel and Sharma (collectively, the "Count XVI Defendants") combined and concerted to accomplish the unlawful purpose of defrauding Allstate by submitting claims for payment to which they were not entitled because (1) the Count XVI Defendants did not provide the services billed to Allstate, (2) the Count XVI Defendants did not provide reasonably necessary services, (3) the Count XVI Defendants did not lawfully render services, and (4) the Count XVI Defendants engaged in fraudulent billing practices.

942.    The Count XVI Defendants formed a meeting of the minds and worked together to achieve an unlawful purpose (namely, defrauding Allstate for personal gain).

943.    This purpose was known to all of the Count XVI Defendants and intentionally pursued by them.

944.    The Count XVI Defendants committed unlawful and overt acts by billing Allstate for services that were not actually provided as represented, were not reasonably necessary, were not lawfully rendered, were fraudulently billed, and by creating and disseminating false medical documentation to accompany their fraudulent bills.

152

945.     In reasonable reliance on the false medical documentation submitted by the Count XVI Defendants, Allstate paid certain of the claims submitted.

946.     All of the Count XVI Defendants directly benefited from the payments made to 59 Pain, 290 Pain, Breeze MRI, and IPS.

947.     All of the Count XVI Defendants actively and intentionally partook in a scheme to defraud Allstate and also encouraged and aided other Count XVI Defendants in the commission of acts done for the benefit of all Count XVI Defendants and to the unjustified detriment of Allstate.

948.     Accordingly, all of the Count XVI Defendants are jointly and severally liable for the fraud perpetrated on Allstate by each other defendant pursuant to their conspiracy.

## <u>COUNT XVII</u>
## MONEY HAD AND RECEIVED
### Against All Defendants

949.     Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-678 as if set forth fully herein.

950.     59 Pain, 290 Pain, Breeze MRI, CXR, HRX, Innovo Management, IPS, An, Casimir, Huynh, and Le, Patel and Sharma (collectively, the "Count XVII Defendants") submitted claims to Allstate that caused Allstate to pay money based upon a reasonable belief in the veracity of the Count XVII Defendants' medical records and bills.

951.     The Count XVII Defendants wrongfully obtained and benefited from payments from Allstate through the fraudulent scheme detailed herein.

952.     Good and services billed by the Count XVII Defendants that were not actually provided as represented, were not reasonably necessary, were not lawfully rendered, or were fraudulently billed had no value.

953.    Money that the Count XVII Defendants obtained from Allstate for goods and services that were not actually provided as represented, were not reasonably necessary, were not lawfully rendered, or were fraudulently billed belongs to Allstate in equity and good conscience, and should be returned to Allstate.

954.    The Count XVII Defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

## COUNT XVIII
### DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### (Against 59 Pain, 290 Pain, Breeze MRI, and IPS)

955.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-678 as if set forth fully herein.

956.    59 Pain, 290 Pain, Breeze MRI, and IPS (collectively, the "Count XVIII Defendants") routinely billed for unnecessary and unlawful services with respect to the patients at issue in this Complaint.

957.    The Count XVIII Defendants also billed for services not rendered.

958.    Pursuant to Texas law, an insurer is liable to pay only for reasonable and necessary expenses arising out of a motor vehicle accident. *In re Allstate Indem. Co.*, 622 S.W.3d 870, 876 (Tex. 2021); *Havgood v. De Escabedo*, 356 S.W.3d 390, 391 (Tex. 2011).

959.    Moreover, a "health care provider commits unprofessional conduct if the health care provider . . . knowingly presents or causes to be presented a false or fraudulent claim for the payment of a loss under an insurance policy." Tex. Occ. Code § 105.002(a)(1).

960.    Where a provider is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident, there can be no

finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

961.   The Count XVIII Defendants submitted, continue to submit, and cause to be submitted claims for unnecessary and/or unlawfully rendered medical services to Allstate, and other claims remain pending with Allstate.

962.   The Count XVIII Defendants will continue to submit and cause to be submitted claims to Allstate absent a declaration by this Court that their activities are unlawful and that Allstate has no obligation to pay pending and previously-denied claims submitted by or on behalf of any of the Count XVIII Defendants.

963.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XVIII Defendants billed for unlawful and medically unnecessary services that are not compensable under Texas law.

964.   Allstate also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XVIII Defendants were engaged in a fraudulent scheme whereby they billed for fraudulent, unnecessary, and unlawful services, and submitted unreasonable charges for the same to Allstate at all relevant times.

965.   As such, the Count XVIII Defendants have no standing to submit, pursue, or receive benefits, or any other payment from Allstate, and Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XVIII Defendants cannot seek payment from Allstate for benefits under any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint.

966.     Allstate further requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XVIII Defendants cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the fraudulent conduct detailed in the within Complaint.

## X.     **DEMAND FOR RELIEF**

WHEREFORE, plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, and Allstate County Mutual Insurance Company, respectfully pray that judgment enter in their favor, as follows:

**COUNT I**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(59 Pain Enterprise)**
**(Against CXR, Breeze MRI, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma)**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT II
### VIOLATION OF 18 U.S.C. § 1962(d)
### (59 Pain Enterprise)
### (Against CXR, Breeze MRI, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma)

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT III
### VIOLATION OF 18 U.S.C. § 1962(c)
### (290 Pain Enterprise)
### (Against CXR, Breeze MRI, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma)

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## <u>COUNT IV</u>
### VIOLATION OF 18 U.S.C. § 1962(d)
### (290 Pain Enterprise)
### (Against CXR, Breeze MRI, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma)

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.


## <u>COUNT V</u>
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Breeze MRI Enterprise)
### (Against 59 Pain, 290 Pain, CXR, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma)

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

**COUNT VI**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Breeze MRI)**
**(Against 59 Pain, 290 Pain, CXR, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma)**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

**COUNT VII**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(CXR Enterprise)**
**(Against 59 Pain, 290 Pain, Breeze MRI, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma)**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT VIII
## VIOLATION OF 18 U.S.C. § 1962(d)
## (CXR Enterprise)
## (Against 59 Pain, 290 Pain, Breeze MRI, HRX, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma)

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT IX
## VIOLATION OF 18 U.S.C. § 1962(c)
## (HRX Enterprise)
## (Against 59 Pain, 290 Pain, Breeze MRI, CXR, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma)

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

**COUNT X**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(HRX Enterprise)**
**(Against 59 Pain, 290 Pain, Breeze MRI, CXR, Innovo Management, IPS, An, Casimir, Huynh, Le, Patel, and Sharma)**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

**COUNT XI**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Innovo Management Enterprise)**
**(Against 59 Pain, 290 Pain, Breeze MRI, CXR, HRX, IPS, An, Casimir, Huynh, Le, Patel, and Sharma)**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT XII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Innovo Management Enterprise)
### (Against 59 Pain, 290 Pain, Breeze MRI, CXR, HRX, IPS, An, Casimir, Huynh, Le, Patel, and Sharma)

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XIII
### VIOLATION OF 18 U.S.C. § 1962(c)
### (IPS Enterprise)
### (Against 59 Pain, 290 Pain, Breeze MRI, CXR, HRX, Innovo Management, An, Casimir, Huynh, Le, Patel, and Sharma)

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

**COUNT XIV**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(IPS Enterprise)**
**(Against 59 Pain, 290 Pain, Breeze MRI, CXR, HRX, Innovo Management, An, Casimir, Huynh, Le, Patel, and Sharma)**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

**COUNT XV**
**COMMON LAW FRAUD**
**Against All Defendants**

(a)    AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)    AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)    GRANT all other relief this Court deems just.

**COUNT XVI**
**CIVIL CONSPIRACY TO COMMIT FRAUD**
**Against All Defendants**

(a)    AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)    AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

163

(c)     GRANT all other relief this Court deems just.

**COUNT XVII**
**MONEY HAD AND RECEIVED**
**Against All Defendants**

(a)     AWARD Allstate restitution in an amount to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

**COUNT XVIII**
**DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201**
**(Against 59 Pain, 290 Pain, Breeze MRI, and IPS)**

(a)     DECLARE that Allstate has no obligation to pay pending and previously-denied insurance claims submitted by 59 Pain, 290 Pain, Breeze MRI, and IPS;

(b)     DECLARE that 59 Pain, 290 Pain, Breeze MRI, and IPS cannot seek payment from Allstate (or any Allstate Insured) pursuant to any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint;

(c)     DECLARE that 59 Pain, 290 Pain, Breeze MRI, and IPS cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the fraudulent conduct detailed in the within Complaint; and

(d)     GRANT such other relief as this Court deems just and appropriate under Texas law and the principles of equity.

**JURY TRIAL DEMAND**

The plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, and Allstate County Mutual Insurance Company, demand a trial by jury on all claims.

164

KING, TILDEN, MCETTRICK & BRINK, P.C.

*/s/ Nathan A. Tilden*

_____
Nathan A. Tilden
ntilden@ktmpc.com
Douglas D. McInnis
dmcinnis@ktmpc.com
350 Granite Street, Suite 2204
Braintree, MA 02184
(617) 770-2214

Attorneys for the Plaintiffs,
*Allstate Insurance Company,*
*Allstate Indemnity Company,*
*Allstate Property & Casualty Insurance Company,*
*Allstate Fire & Casualty Insurance Company, and*
*Allstate County Mutual Insurance Company*

Dated: January 30, 2025

## <u>CERTIFICATE OF SERVICE</u>

I, Nathan A. Tilden, hereby certify that on January 30, 2025, I did file via CM/ECF the **Plaintiffs' Complaint and Demand for Jury Trial.** I hereby certify that, upon issuance of the Summons by the Court, the Complaint and related documents will be served in accordance with Federal Rule of Civil Procedure 4 upon the following defendants:

| | |
|---|---|
| **Innovo Physician Services PLLC**<br>c/o Registered Agent: Young C. An<br>10694 Jones Rd., Ste 110<br>Houston, TX 77065 | **Breeze MRI LLC**<br>c/o Registered Agent: Registered Agents Inc.<br>5900 Balcones Dr, Ste 100<br>Austin, TX 78731 |
| **59 Pain & Rehabilitation Center, Inc.**<br>c/o Registered Agent: Laura Tran Le<br>7443 Southwest Freeway<br>Houston, TX 77074 | **290 Pain & Rehabilitation, Inc.**<br>c/o Registered Agent: Laura Le<br>300 Shepherd Suite B<br>Houston, TX 77009 |
| **Thao T. Huynh, D.C.**<br>10167 Rustic Bend Ct.<br>Houston, TX 77064 | **CXR Investments LLC**<br>c/o Registered Agent: Dilip D. Amin<br>33 Cherry Hills Dr<br>Houston, TX 77064 |
| **Hetansh Investments, Inc. d/b/a HRX Investments**<br>c/o Registered Agent: Deepak Sharma<br>4040 Koehler St, Apt 3023<br>Houston, TX 77007 | **Ravi Patel**<br>9400 Westheimer Rd, Ste 2<br>Houston, TX 77063 |
| **Robert Casimir, D.O.**<br>3918 Kelly Pond Dr<br>Spring, TX 77386 | **Young An, M.D.**<br>858 Wycliffe Dr<br>Houston, TX 77079 |
| **Laura Tran Le, D.C.**<br>7205 Chimney Rock Rd<br>Houston, TX 77081 | **Innovo Management LLC**<br>c/o Registered Agent: Deepak Sharma<br>10694 Jones Rd., Ste 110<br>Houston, TX 77065 |
| **Deepak Sharma**<br>4040 Koehler St, Apt 3023<br>Houston, TX 77007 | |

Date: January 30, 2025

*/s/ Nathan A. Tilden*

_____

Nathan A. Tilden